UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PENNANT MANAGEMENT, INC.,<br><br>        Plaintiff,<br>vs.<br><br>FIRST FARMERS FINANCIAL, LLC, *et al.*,<br><br>        Defendants.<br><br>ILLINOIS METROPOLITAN INVESTMENT FUND and HARVARD SAVINGS BANK, an Illinois Savings Bank,<br><br>        Plaintiff-Intervenors,<br>vs.<br><br>FIRST FARMERS FINANCIAL, LLC, *et al.*,<br><br>        Defendants. | Case No. 14-cv-7581<br><br>Hon. Amy J. St. Eve |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

  Patrick Cavanaugh, as receiver of the Overall Receivership Estate ("Overall Receiver") and Michael Nanosky, as receiver of the Nanosky Receivership Estate ("Nanosky Receiver") (collectively, "the Receivers") move for the entry of an order approving the sale (the "Sale") of five hotel properties (the "Hospitality Properties," or the "Hotels"), and related relief [160], [261], [379]. For the following reasons, the Court substantially grants the Receivers' motions.

1

## BACKGROUND

Pennant Management, Inc. ("Pennant") is a Registered Investment Advisor in the business of acquiring loans on behalf of its clients guaranteed by the U.S. Department of Agriculture ("USDA") or the U.S. Small Business Administration ("SBA") from third-party USDA and SBA approved lenders, such as First Farmers Financial, LLC ("First Farmers"). (R. 182, Second Am. Compl. ¶¶ 1, 27.) From June 2013 to August 2014, Pennant purchased the federally guaranteed portions of 26 separate loans originated by First Farmers for approximately $180 million. (*Id.* ¶¶ 30, 46.) Pennant acquired these loans on behalf of community banks, retirement plans, municipalities and government entities, and labor unions, among other entities. (*Id.* ¶ 27.) In September 2014, Pennant allegedly discovered that none of the 26 borrowers of the First Farmers' loans actually existed, and that the loans were allegedly part of a massive fraud. (*Id.* ¶¶ 37, 46.) Thus, countless investors that invest through Pennant and its clients have allegedly suffered potential losses.

### I.  Procedural Background

On September 29, 2014, Pennant filed its original complaint against First Farmers and associated individuals and entities. (R. 1, Compl.) At the request of the parties, on October 14, 2014 the Court entered an agreed preliminary injunction freezing certain of Defendants' assets. (R. 22, at 2.) These assets included five hotel properties (the "Hospitality Properties"). (*Id.*) The five Hospitality Properties are: 1) Crowne Plaza Orlando – Lake Buena Vista, 12490 Apopka-Vineyard Rd., Orlando, FL ("Orlando LBV"); 2) Crowne Plaza Saddle Brook, 50 Kenny Pl., Saddle Brook, NJ ("Saddle Brook"); 3) Doubletree by Hilton Hotel, Orlando East, UCF Arena, 1215 High Tech Ave., Orlando, FL ("Orlando UCF"); 4) Renaissance by Marriott – Orlando Downtown, 400 W. Livingston St., Orlando, FL ("Downtown Orlando"); and 5) Four Points by Sheraton, 500 Hamilton Blvd., Peoria, IL ("Peoria Property"). (*Id.*; R. 379 ¶ 1.)

On November 10, 2014, the Court then entered an agreed order designating the Nanosky Receiver to exercise control over certain assets of the Defendant Entities, including maintaining and preserving the Hospitality Properties. (R. 29, Initial Receiver Order ¶¶ 2, 4-5, 8.) On April 23, 2015, the Court entered the Amended Receiver Order, which gave Mr. Nanosky continued control over those assets. (R. 122, ¶¶ 4, 5.) The Amended Receiver Order also appointed Patrick Cavanaugh as the Receiver of the Overall Receivership Estate, which includes "all assets other than those assets entrusted to the Nanosky Receivership Estate." (*Id*. ¶ 24(b).) In the event the two Receivers are unable to agree, absent further direction from the Court, the Overall Receiver has the authority to determine how the Nanosky Receiver should proceed. (*Id*. ¶ 10.)

On June 23, 2015, the Receivers filed a motion for the entry of an order approving the sale (the "Sale Motion") of the Hospitality Properties free and clear of all Interests[1], and related relief. (R. 160.) In their motion, the Receivers requested approval to sell the Hospitality Properties to potential purchasers that submitted bids in an online auction (the "Auction") conducted by Auction.com. The Auction closed on July 22, 2015, and counsel for the Overall Receiver represented that the preliminary winning bids totaled over $86 million for the five Hospitality Properties. (R. 240.)

On July 24, 2015, the Court issued an opinion (the "July 2015 Opinion") granting the Receivers' Sale Motion in part with respect to the four non-Peoria Hospitality Properties. (R. 246.) After the Receivers reached an agreement with the SBA to resolve an outstanding lien dispute, on August 5, 2015, the Court then issued an order (the "Peoria Order") granting the Sale Motion in part with respect to the remaining Peoria Property. (R. 270.) The Court found that the Receivers have the legal authority to sell the five Hospitality Properties free and clear of all

---

[1] All terms used in this Opinion shall have the same definitions as contained in the Court's July 2015 Opinion. (*See* R. 246.)

3

Interests, and the Court set a hearing to determine: 1) whether the Receivers' proposed sale of those properties is in the best interest of the receivership estates; 2) whether any individual or entity with an Interest in the Peoria Property has a valid objection to the Receivers' agreement with the SBA; and 3) whether any individual or entity with an Interest in the Hospitality Properties has a valid objection to the Receivers' proposed sale of those properties free and clear of all Interests, or to the attachment of any Interests to their Sale Proceeds with the same force and priority as currently exists[2]. (R. 246, at 19; R. 270, at 3.) The Court also set a deadline of August 25, 2015 for claims and further creditor objections to the sale (the "Claim Date"), and scheduled the hearing on the sale of the Hospitality Properties for September 3, 2015 (the "Sale Hearing"). (*Id.*; R. 268.) Finally, the Court requested that the Receivers file an omnibus motion seeking final approval of the sales and a ruling on the reserved issues. (R. 268.)

On August 24, 2015, the Receivers filed its omnibus motion seeking final approval of the sale of the Hospitality Properties (the "Final Sale Motion"). (R. 379). The Final Sale Motion provided further factual support for the sale of the Hospitality Properties, and responded to several objections[3]. The Final Sale Motion included declarations from Anthony Falor of Auction.com (the "Falor Declaration"), Paul Sexton of HREC Investment Advisors ("HREC") (the "Sexton Declaration"), Scott Kainiewsky of HREC (the "Kainiewsky Declaration"), the Nanosky Receiver (the "Nanosky Declaration"), and the Overall Receiver (the "Cavanaugh

---

[2] The Court also reserved ruling on certain related relief that the Receivers requested, including: (i) issuing a stay against all parties seeking to assert their Interests against the Hospitality Properties or their Sale Proceeds; and (ii) approving the proposed sale procedures. (R. 246, at 10, 18; R. 270, at 3.)

[3] The Receivers represent in the Final Sale Motion that they have complied with the notice requirements that the Court imposed in the July 2015 Opinion and the Peoria Order. Specifically, the Receivers represent that: (1) on July 28, 2015, the Overall Receiver served the *Notice of Proposed Sale of Hospitality Properties, Sale Hearing and Deadline Establishing Bar Date for Filing Proofs of Claim* upon any person or entity known to have asserted an Interest in the non-Peoria Hospitality Properties; and 2) on August 7, 2015, the Overall Receiver served a similar notice upon any person or entity known to have asserted an Interest in the Peoria Property. (R. 252; R. 253; R. 284; R. 301.)

4

Declaration"). In advance of the hearing, the Court received approximately 35 claims. The Court also received several objections to the sale in addition to the responses previously filed by non-parties CVC Hospitality, Inc. ("CVC Hospitality") and True Line Contracting and Remodeling, Inc. ("True Line").

The contested Sale Hearing was scheduled for September 3, 2015. On that date, however, the Receivers, True Line, and CVC Hospitality represented in open court that they had reached a settlement to allow the sale of all five Hospitality Properties to proceed. Both True Line and CVC Hospitality withdrew all of their objections. Given the resolution of True Line and CVC Hospitality's objections[4], and because the Court independently finds that the sale is in the best interests of the receivership estate, the Court substantially grants the Receivers' motion.

## II. Factual Background

The Court takes the following facts from the uncontested, sworn declarations filed in support of the Final Sale Motion, and the testimony given in open court at the Sale Hearing.

### A. HREC and Auction.com

The Nanosky Receiver is the President and CEO of Janus Hotel & Resorts ("Janus"), a Florida-based hotel management company with national operations. (R. 379-4 ¶ 3.) He has over 30 years of experience in all aspects of the hotel and hospitality industry, and has served as a court-appointed receiver for hotel and hospitality properties in over 50 cases. (*Id*.) The Nanosky Receiver began the sale process by interviewing several prospective brokers and other organizations to select the best team to assist with the marketing and sale of the Hospitality

---

[4] Several smaller lien holders have also objected to the Sale. (*See* R. 380, 415, 418.) The Court denies those objections in part for the reasons expressed in the Order staying the Florida Action (R. 428), and because, as discussed below, the Court reserves ruling on the consolidation of any lien claims. The Court also notes that these objections pertain to the Orlando LBV, for which the sale price of the property exceeds all asserted claims by more than $25 million. (*See* R. 240, R. 379-7.)

Properties. (R. 379-4 ¶ 5.) After discussions with creditors of the receivership estate and consulting with his colleagues at Janus, he chose to retain Auction.com and HREC to market and ultimately sell the Hospitality Properties by public auction. (*Id*.) The Nanosky Receiver's decision to retain Auction.com and HREC was based on those firms' qualifications, their combined expertise and experience in the hospitality industry, their marketing and sales approach, their national resources and global reach, and their willingness to reduce their compensation rates in order to take on the assignment. (*Id*. ¶ 6.)

HREC is a brokerage and investment banking company that provides services exclusively to the hospitality industry, specializing in the marketing and selling of hotel and hospitality properties. (R. 379-2 ¶ 6.) HREC has 14 offices throughout the United States. (*Id*.) Auction.com is one of the nation's leading online real estate marketplaces, and has sold more than $30 billion in residential and commercial assets since it was founded in 2007. (R. 379-1 ¶ 6.) Auction.com has over 900 employees and has 8 offices throughout the United States. (*Id*.)

To sell the Hospitality Properties, HREC and Auction.com jointly developed a marketing plan to attract potential buyers. (*Id*. ¶ 22.) They first determined that holding an online auction from July 20, 2015 through July 22, 2015 would allow sufficient time for an effective marketing campaign while still allowing the Auction to take place before the typical August slowdown in the commercial property industry. (*Id*. ¶ 23.) The marketing plan for the Auction had three prongs: direct marketing, print advertising, and digital marketing. (*Id*. ¶ 27.) Direct marketing included: (i) mailing over 1,000 event brochures to parties requesting information about the Auction; (ii) mailing approximately 2,500 event mailers featuring the Hospitality Properties; (iii) attending three conferences that were well attended by persons active in the commercial real estate and hospitality industries; and (iv) conducting over 190 tours of the Hospitality Properties.

(*Id*. ¶¶ 30-36.) Print advertising consisted of placing advertisements in the *Wall Street Journal*, *New York Times*, *Orlando Business Journal*, *Real Estate Weekly*, and the *Peoria Star Journal*. (*Id*. ¶ 37.) Digital marketing included listing the Hospitality Properties on leading commercial real estate and hospitality websites (in addition to Auction.com), including the top Chinese-language property listing service, and conducting internet advertising promotions, targeted e-mail campaigns, and social media promotions. (*Id*. ¶¶ 38, 39.) HREC and Auction.com, for example, sent tens of thousands of e-mails to individuals and entities that they identified as potential purchasers of the Hospitality Properties. (R. 379-2 ¶¶ 34, 36, 40.)

      **B.**      **Orlando UCF**

With respect to the Orlando UCF property specifically, 269 parties signed confidentiality agreements to review due diligence materials for Orlando UCF, and HREC gave 29 property tours. (R. 379-1 ¶ 48; R. 379-2 ¶¶ 31, 38, 41.) Auction.com qualified 15 bidders, of whom 9 participated in the Auction and made 48 collective bids. (R. 379-1 ¶¶ 48, 53.) The bidding started at $8.5 million and Robert J. Guidry Investments, LLC was the winning bidder at the Auction with a final bid of $30.05 million.

      **C.**      **Orlando LBV**

For Orlando LBV, prior to the Auction 268 parties signed confidentiality agreements to review the due diligence materials for the Orlando LBV, and HREC gave 74 property tours. (R. 379-1 ¶ 48; R. 379-2 ¶¶ 31, 38, 41.) Auction.com qualified 20 bidders, of whom 12 participated in the Auction and made 36 collective bids. (R. 379-1 ¶¶ 48, 53.) The bidding started at $6.5 million, and DKR Enterprises, LLC submitted the winning bid of $27.85 million. (*Id*. ¶ 53.)

D.	**Downtown Orlando**

With respect to Downtown Orlando, 237 parties signed confidentiality agreements to review due diligence materials, and HREC gave 33 property tours. (R 379-1 ¶ 48; R. 379-2 ¶¶ 31, 38, 41.) Auction.com qualified 13 bidders, of whom 6 participated in the Auction and made 64 collective bids. (R. 379-1 ¶¶ 48, 53.) The bidding started at $4.5 million, and AFP 109 Corp. submitted the winning bid of $12.625 million. (*Id.* ¶ 53.)

E.	**Saddle Brook**

For Saddle Brook, 242 parties signed confidentiality agreements to review due diligence materials, and HREC gave 41 property tours. (R. 379-1 ¶ 48; R. 379-2 ¶¶ 31, 38, 41.) Auction.com qualified 15 bidders, of whom 10 participated in the Auction and made 69 collective bids. (R. 379-1 ¶¶ 48, 53.) The initial bid was $3.25 million, and Karim Ali submitted the winning bid of $10.45 million. (*Id.* ¶ 53.)

F.	**Peoria Property**

Finally, with respect to the Peoria Property, 112 parties signed confidentiality agreements to review due diligence materials, and HREC gave 15 property tours. (R. 379-1 ¶ 48, R. 379-2 ¶¶ 31, 38, 41.) Auction.com qualified 3 bidders, of whom 2 participated in the Auction and made 35 collective bids. (R. 379-1 ¶¶ 48, 53.) The initial bid was $3.5 million, and Grandview Lodging, Inc. submitted the winning bid of $5.8 million. (*Id.* ¶ 53.)

In summary, the results of the Auction are as follows:

| Property | Final Bid |
|---|---|
| Doubletree UCF | $30,050,000 |
| Orlando LBV | $27,850,000 |
| Downtown Orlando | $12,625,000 |
| Saddle Brook | $10,450,000 |
| Peoria | $5,800,000 |
| **Total** | **$86,775,000** |

(R. 240.)

## ANALYSIS

In their Final Sale Motion, the Receivers move for final approval of the sale of the Hospitality Properties, and related relief. Specifically, the Receivers request that the Court: i) authorize the Receivers to sell the Hospitality Properties free and clear of liens, claims and encumbrances (collectively, the "Interests"), with such Interests, if any, attaching to the proceeds of the sale (the "Sale Proceeds") with the same force and in the same priority as currently exists; ii) stay all proceedings in other jurisdictions seeking to adjudicate any Interests in the Hospitality Properties or the Sale Proceeds and consolidating all litigation regarding such Interests in this Court; and iii) approve the proposed sale procedures. The Court addresses each issue in turn.

**I.    Sale of Hospitality Properties**

In the July 2015 Opinion and the Peoria Order, the Court found that under the appropriate circumstances it had the authority to authorize the Receivers to sell all five Hospitality Properties free and clear of all Interests, with the Interests attaching to the Sale Proceeds with the same

9

force and validity as currently exists. The Court now finds that such a sale is in the best interests of the receivership estates for several reasons.

First, the dollar amounts of the winning bids are significant. The Receivers, HREC, and Auction.com all represent that the winning bids for the Hotels are fair, and no claimant challenges the adequacy of any of the sale prices. (*See e.g.*, R. 379-2 ¶¶ 51, 53, 56, 58, 64; R. 379-1 ¶ 57.) Intervenors Illinois Metropolitan Investment Fund and Harvard Savings Bank, who represent the interests of certain of the allegedly defrauded investors, have expressed their support for the sale as well.

Second, the winning bids track the Hotel valuations calculated by HREC. As part of its engagement, HREC provided the Nanosky Receiver with a valuation range it calculated for each of the Hotels. (R. 379-2 ¶ 48.) For the Orlando UCF, HREC valued the property between $25.4 million and $27.2 million. (R. 379-2 ¶ 50.) The winning bid was $30.05 million. (*Id.* ¶ 51.) HREC valued the Orlando LBV between $23.4 million and $25.2 million. (*Id.* ¶ 52.) The winning bid was $27.85 million. For the Saddle Brook property, HREC valued the property between $10.1 million and $11.1 million. The winning bid was $10.45 million. The winning bid for each of these three properties was either above or within the valuation range calculated by HREC.

With respect to Downtown Orlando, HREC valued the property between $15.95 million and $17.3 million. (*Id.* ¶ 54.) The winning bid was $12.625 million—$3.3 million less than the low end of HREC's valuation range. (*Id.* ¶ 55.) The Court, however, credits the testimony of Paul Sexton[5] of HREC that two unexpected factors negatively affected the actual market value of Downtown Orlando. (*Id.*) First, the State of Florida eliminated funding for a proposed

---

[5] Paul Sexton is Vice President of HREC. (R. 379-2 ¶ 7.) He has 27 years of experience in the commercial real estate industry, during which time he has issued over 500 hospitality property valuation opinions. (*Id.* ¶¶ 5, 47.)

downtown campus of the University of Central Florida during the marketing period. (*Id*. ¶ 55.) The University of Central Florida planned to develop a 10,000-student campus on a plot of land directly across the street from the Downtown Orlando hotel. (*Id*.) The Governor of Florida, however, vetoed that expenditure during the marketing period. (*Id*.) Second, a mold infestation that occurred during the marketing period when the property's air conditioning system failed negatively impacted the condition of the Downtown Orlando property. (*Id.*)

Finally, HREC valued the Peoria Property between $13 million and $15 million. (R. 379-2 ¶ 59.) Although the winning bid for Peoria, $5.8 million, was significantly lower, the Court again credits Mr. Sexton's uncontested representations that certain unexpected factors negatively impacted the price. (*Id*. ¶ 60.) First, HREC learned during the marketing period that it had significantly underestimated the costs needed to complete renovations on Peoria. (*Id*.) It originally believed the cost was approximately $8 million, when it reality it may be as high as $20 million. (*Id*.) Second, HREC discovered that Peoria's parking structure and parking arrangements were significantly worse than it initially believed. (*Id*.) Third, potential buyers for the property had trouble securing debt financing. (*Id*.) Finally, HREC asserts that contrary to its initial information, Peoria municipal officials did not meaningfully support the Peoria Property. (*Id*.)

Third, the combined efforts of HREC and Auction.com were significant. As described above, HREC and Auction.com undertook a joint marketing strategy that led to hundreds of interested parties signing confidentiality agreements to review due diligence materials, 190 tours of the Hospitality Properties, and dozens of offers on the Hotels. The Receivers, HREC, and Auction.com all state that they do not believe they could obtain a higher price if they re-

auctioned the Properties, which no party contests. (*See, e.g.* R. 379-1 ¶ 57; R. 379-2 ¶¶ 51, 53, 56, 58, 64.)

Fourth, the Hospitality Properties are deteriorating assets that are losing a significant amount of money on a monthly basis. Four of the Hotels are not operating currently, and the monthly cost of maintaining, insuring and securing them exceeds $170,000. (R. 379-5 ¶ 12; R. 379-4 ¶ 4.) The sale of these Hotels prevents them from continuing to drain the limited assets of the receivership estate. (*Id.*)

Finally, the Sale Proceeds are much greater than the outstanding lien claims. This fact is significant. As the Court discussed in the July 2015 Opinion, receivership property generally "should not be sold free of liens unless it is made to appear that there is a reasonable prospect that a surplus will be left for general creditors or, in other words, that a substantial equity is to be preserved." 2 Clark on Receivers (3d ed. 1959) § 500(b). The Receivers represent (and no party contests), that the following are the winning bids and the total lien Claims asserted against each of the non-Peoria Properties:

| Property | Final Bid | Total Claims Asserted Against Property[6] |
|---|---|---|
| Orlando UCF | $30,050,000 | $1,983,894 |
| Orlando LBV | $27,850,000 | $2,439,275 |
| Downtown Orlando | $12,625,000 | $512,533 |
| Saddle Brook | $10,450,000 | $5,297,396 |

(R. 240; R. 379-7.)

---

[6] Additionally, the total amount of Claims is likely even smaller because in some instances construction contractors and sub-contractors filed duplicative Claims. *(See* R. 379-7.)

With respect to the Peoria Property, the Receivers represent that the final bid was $5,800,000, and that there are roughly $7,640,000[7] in Claims against the property. (R. 240; R. 379-7; R. 261.) As discussed in detail in the July 2015 Opinion, approximately $4.6 million of those Claims represent a lien held against the property by the SBA. After the Court found that federal law prevented the Receivers from selling the Peoria Property free and clear of the SBA's lien without the SBA's permission, the Receivers and the SBA reached an agreement, subject to Court approval, to release the SBA's lien upon the Sale. (R. 246, R. 261.) True Line, which filed a proof of claim asserting a lien of approximately $2.6 million, initially objected. It has now withdrawn its objection, however, and no other party objects to the sale of the Peoria Property free and clear of its liens. Accordingly, the Court approves the Receivers settlement with the SBA, and authorizes the sale of the Peoria Property.

For these reasons, the Court finds that a sale of the Hospitality Properties free and clear of all Interests, with such Interests attaching to the Sale Proceeds with the same force and in the same priority as currently exists, will maximize the potential recoveries of the alleged defrauded investors while still protecting the rights of claimants with Interests in the Hospitality Properties.

## II.    Stay of Related Proceedings and Consolidation

Next, the Receivers move to stay all proceedings in other jurisdictions seeking to adjudicate any Interests in the Hospitality Properties or the Sale Proceeds, and seek to consolidate all litigation regarding such Interests in this Court. Both True Line and CVC withdrew their objections to this request. Following the hearing on September 3, 2015, the Court entered an order granting the unopposed request of the Overall Receiver to stay all actions involving Interests in the Hospitality Properties pending the close of the Sale. (R. 455.) The

---

[7] The Receivers represent that there are $3,040,959 in known lien claims, in addition to the SBA's lien of $4,599,089, plus interest. (See R. 379-7, at 2; R. 261, at 4.)

Court denies without prejudice the Receivers' request to consolidate any remaining litigation involving Interests in the Hospitality Properties. The Receivers may be able to resolve all pending Claims without Court intervention. If the Receivers wish to pursue consolidation of claims that they are unable to resolve following the close of the Sale, they should file a motion seeking that relief at a later date.

**III.     Sale Procedures**

Finally, the Receivers request that the Court approve the procedures used in the sale of the Hospitality Properties, and waive strict compliance with the requirements of 28 U.S.C. §§ 2001 and 2002. 28 U.S.C. § 2001(a) states:

> Property in the possession of a receiver … appointed by one or more district courts shall be sold at public sale in the district wherein any such receiver was first appointed, at the courthouse of the … city situated therein in which the greater part of the property in such district is located, or on the premises or some parcel thereof located in such … city, as such court directs, unless the court orders the sale of the property or one or more parcels thereof in one or more auxiliary districts.

28 U.S.C. § 2001(a). 28 U.S.C. § 2002 provides further:

> A public sale of realty or interest therein under any order … of any court of the United States shall not be made without notice published once a week for at least four weeks prior to the sale in at least one newspaper regularly issued and of general circulation in the … judicial district of the United States wherein the realty is situated.
>
> If such realty is situated in more than one … district …, such notice shall be published in one or more of the … districts wherein it is situated, as the court directs. The notice shall be substantially in such form and contain such description of the property by reference or otherwise as the court approves. The court may direct that the publication be made in other newspapers.

28 U.S.C. § 2002.

The Court grants approval of the sale procedures for several reasons. No party objects to these procedures. In addition, the sophisticated public auction process employed by

14

Auction.com and HREC obtained a better result than if the Receivers would have only followed the requirements contained in sections 2001 and 2002.  Anthony Falor of Auction.com testified at the hearing, for example, that it could not have achieved the same results if it had only advertised the sales in a local newspaper for four weeks, or if it had held the Auction at a local courthouse or parish.  The creation of a website for marketing and the use of digital marketing through social media and other means enabled Auction.com and HREC to maximize awareness and interest in the properties.  (R. 379 ¶ 28.)  Given the technological tools available to Auction.com and HREC, solely following the archaic procedures in these statutes would have hampered the sales.  Accordingly, the Court hereby waives these requirements.

## CONCLUSION

For the foregoing reasons, the Court substantially grants the Receivers' motions for the entry of an order approving the Sale of the Hospitality Properties, and related relief.


**DATED:  September 4, 2015**               **ENTERED**

                                                                          _____
                                                                          AMY J. ST. EVE
                                                                          U.S. District Court Judge