# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>FIRST FARMERS FINANCIAL LITIGATION | Case No. 14 CV 7581<br><br>Hon. Amy J. St. Eve |

## OVERALL RECEIVER'S EIGHTH REPORT

Patrick Cavanaugh, not individually, but solely in his capacity as Overall Receiver, pursuant to the *Agreed Order Clarifying, Modifying and Expanding the Duties of Receiver Michael Nanosky and to Appoint an Overall Receiver and Regarding Payments to Attorneys and Other Professionals and Related Items*,[1] dated April 23, 2015 ("Amended Receiver Order") [Dkt. No. 122] and the *Order Appointing the Overall Receiver as the Receiver for the Hotel Entities*,[2] dated August 4, 2015 ("Hotel Receiver Order") [Dkt No. 265], hereby submits his eighth report summarizing the activities performed by the Overall Receiver for the period of December 1, 2015 through and including December 31, 2015 ("Reporting Period"), and requests the entry of an order, and states as follows:

### Appointment of the Overall Receiver

1. On November 10, 2014, the Court entered the *Agreed Order Appointing Receiver* ("Original Receiver Order") [Dkt. No. 29] appointing Michael M. Nanosky as receiver (the

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Amended Receiver Order.

[2] The Hotel Entities are: Hospitality LBV, LLC, Alena Hospitality UCF, LLC, Alena Hospitality SSL, LLC, 500 Hamilton Peoria, LLC, a Delaware limited liability company, 500 Hamilton Peoria, LLC, an Illinois limited liability company and Alena Hospitality Saddle Brook, LLC.

"Nanosky Receiver," and together with the Overall Receiver, the "Receivers") to exercise control over the assets owned by the Defendants and to control the Defendant entities.

2. On April 23, 2015, the Court entered the Amended Receiver Order which split the management of the Defendants' assets into two separate receivership estates for the benefit of the Distribution Participants. (*Amended Receiver Order*, ¶ 2.) Under the Amended Receiver Order, the Nanosky Receiver continues to exercise control over five (5) hospitality properties ("Hospitality Properties") and other real property located in Florida, New Jersey and Illinois that he managed under the Original Receiver Order ("Nanosky Receivership Estate"). (*Id.*, ¶¶ 4-5.) The Amended Receiver Order also appointed the Overall Receiver to take possession and control of all assets of the Defendants other than those assets entrusted to the Nanosky Receivership Estate ("Overall Receivership Estate," and together with the Nanosky Receivership Estate, the "Estates"). (*Id.*, ¶¶ 22-24.)

3. In carrying out his duties, however, the Nanosky Receiver is required to confer with the Overall Receiver on how best to serve the interests of both Estates. (*Id.*, ¶ 10.) The Overall Receiver determines how the Nanosky Receiver will proceed in the event of a disagreement over the appropriate course of action unless otherwise directed by the Court. (*Id.*)

4. On August 4, 2015, the Court entered the Hotel Receiver Order. The Hotel Receiver Order appointed the Overall Receiver as the receiver for the Hotel Entities, which collectively own the Hospitality Properties, and vested him with all of the powers, rights and responsibilities provided by law to a receiver in equity.

5. Pursuant to the Amended Receiver Order, the Overall Receiver was required to obtain a surety bond in the amount of $100,000 within 14 days. The Overall Receiver posted and the Court accepted the bond on April 27, 2015. [Dkt. No. 123.]

6. While the Overall Receiver has oversight responsibility for both Estates, significant assets described in Paragraphs 5 and 5(a) of the Amended Receiver Order are entrusted to the Nanosky Receiver. The Nanosky Receiver has filed Receiver Reports [Dkt. Nos. 62, 90-1, 103-1, 114-1, 125-1, 198-1, 303, 477, 666-1 and 726] and will continue to file separate reports as to the activities of the Nanosky Receivership Estate. This report only includes activities of the Overall Receiver and, at the Overall Receiver's direction, High Ridge Partners ("HRP"), relating to the Overall Receivership Estate.

## Prior Overall Receivership Estate Reports

7. Pursuant to the Amended Receiver Order, the Overall Receiver prepared an initial inventory of all property in which the Overall Receiver obtained possession ("Initial Inventory Report"). On May 22, 2015, the Overall Receiver filed the Inventory Report. [Dkt. No. 134.]

8. The Overall Receiver developed the Initial Inventory Report through discussions with the Pennant Management, Inc. ("Plaintiff"), the intervenors and the Nanosky Receiver. As part of this process, the Overall Receiver reviewed various supporting documents made available from the Plaintiff and plaintiff-intervenors and from the Defendants. The Initial Inventory Report reflects the Overall Receiver's preliminary evaluation of the validity and potential value to be recovered by the Overall Receivership Estate on account of the prior asset investigations made by the Plaintiff and Plaintiff-Intervenors.

9. On July 14, 2015, the Court entered the *Order Granting Overall Receiver's Initial Report and for Clarification of the Amended Receiver Order* ("Receiver Procedure Order") that established the procedures by which the Overall Receiver is to obtain approval of his monthly reports for the Overall Receivership Estate. [Dkt. No. 201.]

10. In compliance with the Receiver Procedure Order, the Overall Receiver filed the following monthly operating reports summarizing the activities performed and disbursements made by the Overall Receiver and HRP during the applicable reporting period:

| Receiver Report | Reporting Period | Date Approved |
| --- | --- | --- |
| Initial Report, dated June 19, 2015 [Dkt. No. 154] | April 23, 2015 – May 31, 2015 | July 14, 2015 [Dkt. No. 201] |
| Second Report, dated July 24, 2015 [Dkt. No. 247] | June 1, 2015 – June 30, 2015 | August 5, 2015 [Dkt. No. 269] |
| Third Report, dated August 25, 2015 [Dkt. No. 398] | July 1, 2015 – July 31, 2015 | September 8, 2015 [Dkt. No. 473] |
| Fourth Report, dated September 25, 2015 [Dkt. No. 510] | August 1, 2015 – August 31, 2015 | October 16, 2015 [Dkt. No. 555] |
| Fifth Report, dated October 26, 2015 [Dkt. No. 593] | September 1, 2015 – September 30, 2015 | November 10, 2015 [Dkt. No. 643] |
| Sixth Report, dated November 25, 2015 [Dkt. No. 688] | October 1, 2015 – October 31, 2015 | December 14, 2015 [Dkt. No. 733] |
| Seventh Report, dated December 18, 2015 [Dkt. No. 754] | November 1, 2015 – November 30, 2015 | January 14, 2016 [Dkt. No. 821] |

**Assets of the Overall Receivership Estate**

11. The narrative set forth below provides a summary of the services performed by the Overall Receiver and HRP for the Reporting Period with respect to the identified assets of the Overall Receivership Estate:

(a) **Closing of Hospitality Property Sales** – Among the assets of these Estates are following Hospitality Properties: (i) Four Points by Sheraton, 500 Hamilton Blvd., Peoria, IL ("Peoria"); (ii) Crowne Plaza Saddle Brook, 50 Kenny Pl., Saddle Brook, NJ ("Saddle Brook"); (iii) Doubletree by Hilton Hotel, Orlando East, UCF Area, 1215 High Tech Ave., Orlando, FL ("Orlando UCF"); (iv) Renaissance by Marriott – Orlando Downtown, 400 W. Livingston St., Orlando FL ("Downtown Orlando") and (iv) Crown Plaza Orlando – Lake Buena Vista, 12490 Apopke-Vineyard Rd., Orlando, FL ("Orlando LBV").

As previously reported, the Receivers closed the Downtown Orlando and Orlando LBV sales in September 2015. The Receivers also closed Saddle Brook and the Peoria sales on October 2, 2015 and on October 30, 2015, respectively. As of December 31, 2015, the updated proceeds from the closed sales are as follows:

| Property | Date of Closing | Sale Price | Net Closing Costs, Mortgages, Other Credits, Proration and Lien Settlement | Remaining Reserve for Mechanics Liens (Reserved at 175%) | Plus: Other Credits | Total |
|---|---|---|---|---|---|---|
| Downtown Orlando | 9/25/2015 | $12,625,000 | $340,730 | $129,028 | $0 | $12,155,242 |
| Lake Buena Vista | 9/28/2015 | $27,850,000 | $1,624,972 | $17,456 | $25,000 | $26,232,572 |
| Saddle Brook | 10/2/2015 | $10,450,000 | $64,100 | $10,385,900 | $0 | $0 |
| Peoria | 10/30/2015 | $5,800,000 | $5,204,201 | $0 | $0 [3] | $595,799 |
| Orlando UCF | tbd | | | $1,246,098 | | ($1,246,098) |
| **Total** | | **$56,725,000** | **$7,234,003** | **$11,778,482** | **$25,000** | **$37,737,515** |

On October 19, 2015, the Court entered an order approving the Receivers' settlement with CVC Hospitality, Inc. ("CVC"), the general contractor for Orlando LBV, which resolved approximately $2.3 million in mechanics lien claims asserted by CVC and its subcontractors against LBV Orlando for the amount of $1,150,000 ("CVC Settlement Amount"). [Dkt. No. 558.] On November 11, 2015, the Court also entered an order approving the Receivers' settlement with True Line Contracting and Remodeling, Inc. ("True Line") which resolved

---

[3] Pursuant to the Court's order dated October 29, 2015 [Docket No. 605], the Overall Receiver deposited in escrow with the title company the amount of $4,310,000 to fund escrow required to close the sale of the Peoria hospitality property. These funds were returned to the Overall Receiver on December 14, 2015 upon settlement of the lien claims on this property.

{10516-002 RPT A0428725.DOCX 2}   5

approximately $10.1 million in mechanics lien claims asserted by True Line and its subcontractors against the remaining Hospitality Properties for the amount of $2,490,000 ("True Line Settlement Amount").

The Overall Receiver funded $1,246,098 into escrow to be held at the title company on December 16, 2015 for the settlement of the liens asserted by True Line and its subcontractors against Orlando UCF. The funds deposited in escrow with the title company that exceed the CVC Settlement Amount, the True Line Settlement Amount, the amount of any other allowed mechanics' liens at the hospitality properties, and any outstanding tax liabilities will be transferred to the Overall Receiver. During the Reporting Period, the Overall Receiver obtained the release of $683,921 from the Downtown Orlando escrow and $4,838,842 from the Peoria escrow, of which $4,310,000 was funded by the Overall Receiver at the closing. The Overall Receiver estimates that, after satisfaction of all required payments due under the settlement agreements or otherwise, approximately $8.3 million to $9.1 million of the funds remaining in escrow at the title company as of December 31, 2015 will be transferred to the Overall Receiver depending upon the resolution certain claims asserted by the State of New Jersey related to the Saddle Brook property.

With respect to Orlando UCF, Orlando International Hotels, LLC, as assignee of Robert J. Guidry Investments, LLC (collectively, "Guidry"), was the approved purchaser of the property with a purchase price of $30,050,000. Pursuant to the applicable Purchase and Sale Agreement ("PSA"), Guidry deposited $1,527,500 as an earnest money deposit ("Deposit"). Guidry subsequently contended that it terminated the PSA and is therefore entitled to the return of the Deposit. The Receivers disagreed that Guidry validly terminated the PSA, and therefore refused to return the Deposit to Plaintiffs. On September 28, 2015, Guidry filed a civil action against the

Receivers ("UCF Litigation"), seeking a declaratory judgment that it terminated the PSA and is entitled to the Deposit. The Receivers intend to contend that, among other things, Guidry breached the PSA and is not entitled to the Deposit. The Overall Receiver filed his answer to Guidry's complaint and a counterclaim on January 15, 2016.

On December 18, 2015, the Overall Receiver entered into a contract for the sale of Orlando UCF in the amount of $25,000,000 with White Diamond Hospitality LLC, subject to Court approval and higher and better offers at auction. On December 29, 2015, filed the Overall Receiver's Motion for Entry of an Oder Approving (I) Bidding Procedures and Bid Protections; (II) the Sale of the Orlando UCF Hospitality Property Free and Clear of All Interests; (III) the Form and Manner of Notice with Respect Thereto; and (IV) Related Relief. [Dkt. No. 765] On January 8, 2016, the Court entered an order approving the sale procedures for Orlando UCF and provided for an auction on February 23, 2016 and a final sale hearing on February 29, 2016.

(b) **Point Cypress, LLC**. On September 15, 2015, the Court approved a modification to the Receivership Order providing for the appointment of the Overall Receiver as receiver for Point Cypress, LLC ("Point Cypress"), which owns a vacant parcel of land located on Point Cypress Drive in Orlando, Florida. The Court further authorized the Overall Receiver to employ Coldwell Bank to list the Point Cypress property for sale. Since that time, the Point Cypress property has been actively marketed, and the Overall Receiver has received several offers. The Overall Receiver is currently working with Coldwell Banker to negotiate a contract with a potential buyer on a sale agreement that will be subject to Court approval and any higher and better offers that the Overall Receiver may receive for the property.

(c) **7411 Investments, LLC**. On December 30, 2015, the Overall Receiver filed a motion to appoint himself as the receiver for 7411 Investments, LLC. [Dkt. No. 767].

The Overall Receiver received an objection from the NeJame Law Firm. The matter is currently being briefed.

(d) **Cash Assets**. As of December 31, 2015, the aggregate cash balance held in all accounts maintained by the Overall Receiver was $38, 813,117. The Overall Receiver continues to utilize an operating account at BMO Harris Bank ending in #6202 ("Operating Account"). The account is primarily used to receive payments from borrowers under various loans made by the Defendants and to pay administrative expenses of the Overall Receivership Estate. As of December 31, 2015, the balance held in the Operating Account was $13,808,299. The Overall Receiver also established interest-bearing accounts at several financial institutions. As of December 31, 2015, the account balances in the interest-bearing accounts were as follows:

| Bank | Balance at December 31, 2015 |
|---|---|
| American Chartered Bank | $ 2,000,581 |
| BMO Harris Bank Money Market | $ 15,003,035 |
| First Midwest Bank | $ 4,000,036 |
| Wintrust Commercial | $ 4,001,166 |
| **Total** | **$ 25,004,818** |

A summary of the cash receipts and disbursements is set forth in detail in the Banking and Financial Activity section of this report.

(e) **USDA Guaranteed Loans**. The Defendants made four (4) loans to various companies under the United States Department of Agriculture ("USDA") Rural Development guaranteed loan program (collectively, the "USDA Guaranteed Loans"). The Overall Receiver sold the Estates' interest in two of those loans for the amount of $963,975. The following is a general status of the remaining two USDA Guaranteed Loans in which the Estates have an interest:

**(i)** **The Sunday Horse II, LLC** ("Sunday Horse") – Sunday Horse is a loan made to finance the production of the feature film named "The Sunday Horse." The filming of the movie is complete, but Sunday Horse has limited funds available to pay for the marketing and advertising costs for distribution of the film in the domestic theatrical market. Likewise, Sunday Horse requested, through the Overall Receiver, and the USDA granted, a payment moratorium through December 31, 2015. The Overall Receiver, with assistance of counsel, prepared a forbearance agreement to reflect the payment moratorium. Sunday Horse intends to launch a limited theatrical release of the film in targeted domestic markets in January 2016 and will only pursue wider distribution of the movie based upon the initial results of the film release. Domestic and foreign distribution agreements (or term sheets related thereto) have been reviewed and approved by the Overall Receiver and the USDA, as required. No acceptable offer to purchase this loan was received as a result of the marketing of the loans by GLS. As of December 31, 2015, the Overall Receiver's 10% interest in the outstanding loan was $705,635, plus accrued and unpaid interest.

**(ii)** **Lancaster Energy Partners, LLC** ("Lancaster") – Lancaster is a loan made to finance the costs of converting a former coal burning electrical facility to a bio-mass electrical plant utilizing scrap wood as the sole fuel source. The facility is located in Thomaston, Georgia. Completion of the conversion was delayed due to delays in construction and reported financial improprieties of the project manager and general contractor. Lancaster made a request, through the Overall Receiver, for a payment moratorium through December 2015 to allow them to obtain additional investors to complete the project. The USDA declined Lancaster's initial request. The Overall Receiver submitted a follow-up request, which provided additional information in an attempt to address the USDA's points of declination. This subsequent request was approved by the USDA, however, the borrower and the Overall Receiver are not able to comply with the approval due to the numerous and immoderate conditions of the approval. Therefore, the Overall Receiver elected to market for sale the non-guaranteed portion of the note with existing payment defaults. The Overall Receiver did not receive any bids for this loan. The Overall Receiver will continue to assist in the negotiations with the USDA and monitor the progress of Lancaster's attempts to obtain additional investors or sell the entire facility. On September 16, 2015, a secondary market holder with a $6,329,905 participation in the USDA guaranteed portion of the loan made a demand for repurchase of its interest. The Overall Receiver timely declined the repurchase request. The Overall Receiver learned that the general liability and property insurance lapsed and was not renewed. The Overall Receiver filed a motion on November 6, 2015 to seek the authority to purchase insurance with a right of first recovery with respect to the expense. [Dkt No. 631.] On November 10, 2015 the Court entered an order authorizing the Overall Receiver to purchase the insurance to protect the Estates' interest in the Lancaster assets. [Dkt No. 646] As of December 31, 2015, the Overall Receiver's 10% interest in the outstanding loan was $950,436 plus accrued and outstanding interest.

(f) **Conventional Loans**. During the Reporting Period, the Overall Receiver continued to verify the validity of the Conventional Loans by searching the Defendants' financial and banking records that have been made available and engaged in discussions with the borrowers, borrower's counsel and unrelated third parties with respect to the repayment, recovery or purchase of the assets. The following is a general status of each of the Conventional Loans currently owned by the Estates:

(i) **Aura Florida Lounges, LLC** ("Aura") – Based on review of available documents, it appears the borrower abandoned and surrendered the collateral to the landlord. The loan obligation dated May 20, 2014 was in the original principal amount of $450,000. The collateral consisted of various restaurant furniture and equipment. Based on discussions with the landlord, an agreement was reached to release the lien on the collateral in exchange for a payment of $10,000. It was determined that this amount is reasonable compared to any potential recovery through a liquidation sale based on a site visit and inspection of the equipment. The Overall Receiver utilized a skip-tracing service to locate the personal guarantors. A Notice of Default and Demand for Immediate Payment was delivered to the guarantor as confirmed by signature upon delivery. No response from Ms. Herman has been received. Based on the Overall Receiver's investigation to date, the likelihood of a recovery from Ms. Herman is unknown. The Overall Receiver determined that Mr. Jesse Newton also personally guaranteed the loan. Therefore, the Overall Receiver issued a default and demand notice to Mr. Newton on October 14, 2015. Mr. Newton has not responded to this demand. The Overall Receiver instructed his counsel to file a collection action against both Ms. Herman and Mr. Newton in January 2016.

(ii) **Charter School Development Services, Inc. and Edu-Pro Management, LLC** – These two loans, with a combined outstanding balance of $12,075,833, were made for the purpose of constructing and/or renovating two facilities in Florida to be used for charter schools. Through discussions with the borrower's principal, Vince Desai, the Overall Receiver learned that the operator of the charter schools, Acclaim Academy Florida, Inc. ("Acclaim"), announced the closing of the schools due to two consecutive years of poor grades and decertification by their respective school boards. On May 20, 2015, Acclaim filed a voluntary chapter 7 petition in the United States Bankruptcy Court for the Middle District of Florida (Bankr. Case No. 6:15-bk-04416). Mr. Desai requested a payment reduction or moratorium due to the loss of revenue until he can complete repairs to the buildings and secure new tenants. Charter School Development Services, Inc. entered into a 5-year lease agreement, with options to renew, dated March 30, 2015 with Avant Garde Academy, Inc. for the school

located in Kissimmee, Florida. Mr. Desai received the first rent check on September 18, 2015 and remitted a check in the amount of $50,000 to the Overall Receiver on October 9, 2015. Mr. Desai has not yet found a tenant for the Jacksonville school and estimates that repairs in the approximate amount of $86,000 are required for this facility. The Overall Receiver engaged in discussions with two prospective buyers, only one of which is currently performing due diligence with respect to the purchase of the mortgage notes. The Overall Receiver issued a demand notice and accelerated the payment obligations in full and demanded payment from the borrower and the guarantor. The Overall Receiver is evaluating whether to enter into a forbearance agreement if the borrower (i) provides proof of insurance, (ii) provides certain financial and other information regarding the borrower's operations and (iii) agrees to the refinance or sale of the properties on terms acceptable to the Overall Receiver. The Overall Receiver intends to file a foreclosure action if the borrower does not enter into an acceptable forbearance agreement.

**(iii)** **Davenport Ventures II, LLC** ("Davenport") – In 2012, First Farmers Financial, LLC ("FFF") made a $3.7 million loan (approximately $3.5 million is currently outstanding) to Captain's Cay Hotel Davenport, LLC ("Captain's Cay") for the purchase of a hotel in Davenport, Florida that is currently known as the Quality Inn Maingate South. The hotel property was sold in 2014 to Davenport, which is owned and controlled by Nikesh Patel's ("Nikesh") father, Ajay G. Patel. On June 1, 2015, the Overall Receiver received notice from the U.S. Small Business Administration ("SBA") that the SBA guaranteed position (80%) plus a non-guaranteed portion (5%) of this loan was sold in the secondary market. The Estates' retained portion of this loan (15%) is approximately $541,674. The SBA has raised concerns regarding whether Captain's Cay used the loan proceeds in compliance with the SBA loan documents, and with respect to the unauthorized sale to Davenport. In October 2015, the SBA notified the Overall Receiver that Davenport defaulted on its loan obligations. On December 7, 2015, the Overall Receiver filed a foreclosure complaint against Davenport, Captain's Cay, Niraj V. Patel, Ajay G. Patel, the SBA and non-record claimants. [Dkt. No. 709] In the complaint, the Overall Receiver seeks to foreclose on the hotel and obtain judgments against the defendants with respect to their obligations under the loan documents. On December 7, 2015, the Overall Receiver filed a Motion seeking to be appointed as the Receiver of Davenport. [Dkt. No. 709] Davenport Ventures has opposed the Overall Receiver's motion to appoint himself as receiver for the hotel and also filed a motion to dismiss for lack of subject matter jurisdiction, which the Court recently denied. The Court authorized the Overall Receiver to conduct limited, expedited discovery regarding the Receiver Motion which is ongoing. The other parties have been served but have not responded to the complaint. The Overall Receiver is also finalizing an agreement with SBA regarding the prosecution of the foreclosure action and treatment of SBA's claim

      **(iv)** **Niranjan B. Patel & Minaxi N. Patel** – While the borrower is remitting monthly payments to the Overall Receiver, the dollar amount of the payments are less than the required payment pursuant to the mortgage note. The note is dated April 2, 2013 in the original principal amount of $679,975 and the first 12 months required the payment of interest only, with escalating payments pursuant to the terms of the note. FFF purchased the loan for $385,000 prior to foreclosure by the original unrelated lender in April 2013 due to an ongoing payment default. The loan is secured by a lien on a Red Carpet Inn hotel located in South Daytona Beach, Florida. The Overall Receiver contacted the borrowers to discuss various options to monetize the note either through a refinancing or the sale of the note to a third party. Subsequently, the borrower's attorney has been in contact with the Overall Receiver to provide updates with respect to the borrower's attempts to refinance the property. It is likely that an offer to purchase the note or pay off the loan will be at a substantial discount from the current outstanding balance. Three additional parties have signed non-disclosure agreements and are reviewing the loan documents, but none of the parties have expressed an interest in pursuing the acquisition of the loans or the property. The Overall Receiver provided a pay-off figure as of November 16, 2015 to counsel for the borrowers on October 15, 2015, as requested by their counsel. The borrower did not submit a settlement offer to the Overall Receiver by December 15, 2015. Therefore, the Overall Receiver intends to move for the appointment of a receiver for the hotel property and the engagement of the Nanosky Receiver to manage the property in January or February 2016. Meanwhile, the borrower continues to remit monthly payments in the amount of $3,000.

      **(v)** **Standley Plastics, Inc.** ("Standley") – On October 27, 2013, FFF made a loan to Standley in the amount of $2,000,000. When the Overall Receiver initially contacted Standley about this loan, the company asserted that it incurred significant losses and extraordinary costs due to the failure of FFF to follow through on its commitment to fund the expansion of the business. The Overall Receiver subsequently issued a demand and acceleration notice to Standley and the guarantor of the loan, Steven Standley. On November 13, 2015, the Overall Receiver filed a complaint against Standley Plastics and Steven Standley to recover the outstanding principal and interest due under the loan. [Doc. No. 660] In response to the complaint, on December 7, 2015, the defendants filed an answer, affirmative defenses and a counterclaim against the Overall Receiver. [Doc. No. 715 and 717] The Overall Receiver's deadline to respond to the defendants' counterclaim is due January 15, 2016.

      (g)    **Deposits and Retainers** – The following is a general status on the investigation related to outstanding deposits and retainers:

      **(i)**    **Ward Harris Properties, Inc.** ("Ward Harris") – On July 23, 2014, Las Olas Hotel Group, LLC ("Las Olas") entered into a commercial real estate contract with Ward Harris for the purchase of real estate located at 2901 East Las

Olas Boulevard, Fort Lauderdale, Florida. The purchase price was $4,000,000 with a $300,000 escrow deposit to be held by Stewart Title Guaranty Company ("Stewart"). According to research performed by the Overall Receiver, Las Olas was formed on July 3, 2014 and Nikesh A. Patel and Vinay M. Rama were listed as the members. The Overall Receiver contacted Stewart and verified that a wire transfer was received on June 18, 2014 in the amount of $300,000 from FFF and subsequently transferred to an escrow account opened for this transaction on July 24, 2014. The Overall Receiver determined that on June 18, 2014, FFF wired the amount of $300,000 to Stewart from an FFF bank account ending in 7145 with a memo stating "Alena Hospitality – Las Olas." On August 22, 2014, an amendment to the original contract was entered into by Las Olas and Ward Harris extending the date to close the sale to October 21, 2014. As part of this agreement, a non-refundable "Extension Fee" of $500,000 was to be deposited with Ward Harris' counsel, Robert M. Bulfin, P.A., as a credit to the purchase price at closing. On August 22, 2014, FFF caused the amount of $500,000 to be transferred from the same FFF bank account with a memo stating "Ft. Lauderdale Project." According to Mr. Bulfin, the $500,000 was disbursed to Ward Harris and a demand has been placed on the $300,000 deposit held by Stewart due to a default by Las Olas. The Overall Receiver has requested, by subpoena, additional documentation from Ward Harris including the nature of the default. Ward Harris has responded to the subpoena and based on a review of the information provided, additional information has been requested. The Overall Receiver has not received a response from Ward Harris. On December 16, 2015, the Overall Receiver filed a Motion seeking to be appointed as the Receiver of Las Olas [Dkt. No. 739]. This Motion was granted on December 22, 2015 [Dkt. No. 763], and on January 8, 2016, the Overall Receiver filed a complaint against Ward Harris to recover the $800,000.

**(ii) HTG Crystal Cove Resort, LLP** ("Crystal Cove") – On March 14, 2014, Alena Hospitality, LLC ("Alena") entered into a contract to purchase certain property and assets located on or associated with a proposed site plan for the development of a resort located at 4900 Overseas Highway, Marathon, Florida. The total purchase price was $7,500,000 with an earnest money deposit of $500,000 to be held by Stewart. The Overall Receiver confirmed with Stewart the receipt of $500,000 from Alena. During the 30 day due diligence period, Alena discovered that Crystal Cove never owned 200 of the 300 feet of frontage road property as claimed in the purchase contract. Upon this discovery, Alena demanded the return of the $500,000 deposit but Crystal Cove refused to give consent to Stewart to release the funds. Alena filed a complaint in the 11th Judicial Circuit Court (Case No. 2014-13088-CA-01) seeking the recovery of the deposit and other damages. The Overall Receiver has contacted the attorney representing Alena to discuss the case and has also contacted counsel for Crystal Cove. Based on these discussions and a review of the merits of FFF's claim, the Overall Receiver entered into a settlement agreement with Crystal Cove in which the Estate would receive $325,000 of the total deposit of $500,000. On November 19, 2015 the Court entered an order approving the Overall Receiver's

settlement with Crystal Cove. [Dkt. No. 676] On December 1, 2015, Stewart released the $325,000 deposit to the Overall Receiver.

      **(iii)   CXA-10 Corporation** ("CXA") – On March 6, 2014, Alena entered into an Agreement of Purchase and Sale with CXA to purchase certain property commonly known as the Knights Key located at 1 Knights Key Blvd, Marathon, Florida. The total purchase price was $28,000,000 with a non-refundable earnest money deposit of $2,000,000 to be held by Fidelity National Title Group ("Fidelity"). The Overall Receiver confirmed with Fidelity the receipt of $2,000,000 from Alena. The agreement was terminated on April 30, 2014 pursuant to a mutual agreement and release and the $2,000,000 deposit was split between CXA and Alena. The Overall Receiver verified the $1,000,000 returned deposit with Fidelity and noted the deposit to Alena's bank account. Based on review of documents submitted by CXA, the agreement was terminated due to potential environmental issues raised by Alena which CXA disputed. The Overall Receiver will continue to investigate any potential claim the Estate may have to recover the remaining $1,000,000 deposit and will take appropriate action if deemed necessary.

      **(iv)   8444 Investments, LLC** ("Investments") - On May 30, 2014, Alena entered into a Letter of Intent with Investments to purchase certain properties commonly known as the Allure (f/k/a Radisson Inn), The Metropolitan Resort and the adjacent lot located off International Drive, Orlando, Florida for the amount of $34,000,000. Upon execution of Letter of Intent, Alena wired a $300,000 earnest money deposit to Stewart. On May 30, 2014, Alena and Investments entered into an Agreement of Purchase and Sale and an additional deposit of $200,000 was wired to Stewart. On July 28, 2014, Alena sent a letter to Investments exercising its right under the Agreement of Purchase and Sale to extend the closing date and, on July 30, 2014, wired a non-refundable deposit in the amount of $200,000 to Stewart. The Overall Receiver verified all deposits with Stewart. The first deposit of $300,000 was wired from Alena's bank account and the other two (2) deposits totaling $400,000 were wired from a FFF bank account. According to Stewart, on July 30, 2014, the total deposit of $700,000 was wired to Hotel Mortgage Funding, LLC ("Hotel Mortgage") pursuant to an agreement between Alena and Investments. The Overall Receiver requested additional information, by subpoena, from Investments and Hotel Mortgage. In reviewing the information produced from Investments and Hotel Mortgage, the Overall Receiver learned that an additional $500,000 was sent to Hotel Mortgage Funding for another extension of the contract. Counsel for the Overall Receiver is reviewing all of the documents to determine the reasonableness of these deposits and the facts surrounding the termination of the contract.

      **(v)   Legal Retainers** – The Overall Receiver has been in discussions with Foley & Lardner LLP ("Foley") regarding the $375,000 held in its trust account related to the defense of several of the Defendants in both civil and criminal litigation. Foley filed an interpleader action with the Court relative to the

ownership of the $375,000. On August 8, 2015, the Court entered an order authorizing Foley to pay the funds held in their trust account into the Court Registry. [Dkt. No. 275.] The Overall Receiver is also investigating the source of an additional $375,000 received by Foley from certain entities to represent the individual Defendants. On October 6, 2015, the Court entered an order establishing a protocol by which any parties laying claim to the interplead funds can have such claims resolved by the Court so that the funds would be disbursed per Court order or the agreement of the parties. The Overall Receiver filed a claim to the interplead funds and a group consisting of Ankur Patel, Pinu Patel and Patel Construction, LLC has also filed a claim to the interplead funds. Those parties are currently following the protocol established by the Court to resolve those competing claims in the interpleader action.

(h) **Additional Litigation**. In addition to the litigation discussed above, the Overall Receiver has commenced litigation against the following individuals to recover certain fraudulent transfers made by FFF:

**(i)** **Timothy Fisher** ("Fisher") – The Overall Receiver discovered that since January 1, 2012, FFF made twenty-four (24) payments to Fisher totaling $4,546,200 to his personal account. The Overall Receiver filed a complaint against Fisher to provide an accounting of the use of the payments in an effort to recover the funds. It was subsequently learned that Fisher sold his home after the expiration of the *Agreed Order for Preliminary Injunction by Consent of Defendants Timothy Glenn Fisher, Translucent Entertainment, LLC, Alena Production, LLC and ASL Pictures, LLC* dated December 17, 2014 [Dkt No. 70.] The Overall Receiver filed an emergency motion with the Court [Dkt No. 586.] to prevent Fisher from using the proceeds of the sale. The Overall Receiver's Motion was granted, but Fisher, through his counsel, has filed an Emergency Motion to Reconsider that Order. Fisher's Emergency Motion is currently pending as the parties attempt to determine if they can agree upon a fair distribution of the sales proceeds. Towards that end, Fisher and his counsel have provided the Overall Receiver with a preliminary accounting of the use of proceeds from the sale of the home and the payments received from FFF. The Overall Receiver will take appropriate action after reviewing the relevant documents provided by Fisher.

**(ii)** **Matthew Cohen** – On February 20, 2015, a wire transfer of $476,301.82 was made from FFF to Real Estate Closing Solutions with a reference "Closing for Matt Cohen." Upon review of FFF's records and discussions with counsel for Patel, Matthew Cohen ("Cohen") was a former employee of Vision Hospitality Construction, LLC ("Vision"). Cohen and his wife received the benefit of the wire transfer, which they used to purchase a home in Orlando, Florida. Cohen claims that the wire transfer was an advance on future distributions that his company – Midtown Builders and Consultants, Inc. – would

purportedly receive as 10% owner of Vision. The Overall Receiver also has learned that Mr. Cohen subsequently sold the Orlando property for approximately $570,000. The Overall Receiver has filed a complaint against Cohen and his spouse seeking to recover the transferred funds.

(i) **Additional Assets Subject to Review.** – As discussed in the Initial Inventory Report, the Overall Receiver and HRP continue to review a large number of documents to locate additional assets for recovery by the Estates. As part of his review, the Overall Receiver has determined that additional investigation is necessary with respect to the following potential sources of recovery:

**(i) India Vacation Home** – During the review of the Defendants' documents, a vacation home in India was noted on a personal financial statement of Nikesh. The Overall Receiver is investigating the existence of the home and the source of funds used to purchase the home. The Overall Receiver has been in discussions with counsel for Patel to verify the existence, ownership and value of the home in order to develop a plan of liquidation.

**(ii) Zeolife** - On August 8, 2014, a $500,000 wire transfer from FFF's bank account at BMO Harris was made to Zeolife. Through the Overall Receiver's cash tracing efforts, an additional $250,000 was wired to Zeolife on August 1, 2013 from a bank account maintained by FFF at PNC Bank. Including the $1,130,000 claimed to be transferred from Fisher's personal account, the total amount transferred to Zeolife is $1,880,000. Upon discussions with Jim Yiannios of Zeolife, the funds were used to develop and produce a product called Gluco Systems Complete, a naturally derived alternative to the current standard pharmacologic approach to control hyperglycemia. Mr. Yiannios claims that a significant portion of the funds were used to renovate a 20,000 square foot building located in Las Vegas, Nevada to allow for the production of the supplement. According to Mr. Yiannios, once the supplement was developed, it was to be the Defendants responsibility to prepare and implement a marketing plan. The Overall Receiver has requested financial information from Zeolife to account for the funds transferred and an estimated cost to bring the supplement to market. No formal agreements have been found concerning this partnership. The lack of a formal agreement to evidence the investment limits the ability for the Overall Receiver to sell its interest. Further investigation is necessary to determine the full extent of this investment before an effective plan can be implemented.

**(iii) ProFeeds Solutions, Inc.** – The Overall Receiver discovered documentation that referred to a potential investment in a cattle feed company. The Overall Receiver located a wire transfer in the amount of $165,000 to

ProFeeds Solutions on August 8, 2014. Further investigation found that an additional $645,000 was sent to ProFeeds Solutions from the personal account of Fisher. Fisher claims the funds sent to ProFeeds were a loan and not an investment in ProFeeds. The Overall Receiver has not been able to locate documentation to determine whether the funds represent an investment or a loan. Further investigation is necessary to determine the full extent of this investment/loan before an effective plan can be implemented.

**(iv) Miscellaneous Disbursements** – While reviewing various bank records, several large disbursements to individuals were noted. The Overall Receiver is in the process of locating and contacting these individuals to determine the nature of the transaction and will take appropriate actions to recover the funds.

(j) **Political and Charitable Contributions** – Further investigation is required to determine the feasibility of pursuing the recovery of these funds totaling approximately $185,000.

## Banking and Financial Activity

12. During the Reporting Period, the Overall Receiver collected $4,666,746 from (i) payments on the Conventional Loans, (ii) the return of funds escrowed for construction liens (net of additional escrow payments), (iii) the recovery of funds previously held by William Huseman, (iv) payment of the Crystal Cove settlement and (v) interest earned.

13. During the period the Overall Receiver disbursed a total of $181,316. The disbursements included (i) $2,942 for web-hosting services, (ii) $70,783 to the Overall Receiver on account of the Overall Receiver's approved fees and expenses for November 2015 [Dkt. No. 732], (iii) $105,991 to Shaw Fishman Glantz & Towbin LLC in partial payment of November 2015 fees and expenses, and (iv) $1,598 for bank charges. All of the disbursements made by the Overall Receiver were authorized under the *Order Granting Overall Receiver's Initial Report and for Clarification of the Amended Receiver Order*, dated July 14, 2015 [Dkt. No. 201] or other order of this Court. A detailed accounting of all cash receipts and disbursements is set forth in **Exhibit A**.

### Document Review and Management

14. The Overall Receiver continued consolidation of all physical and electronic records obtained from the Defendants. Boxes of physical records were moved from multiple locations to the Overall Receiver's office. An inventory of the contents has been completed and key documents have been scanned for future reference. The Overall Receiver has also reorganized the documents to consolidate related information. On November 10, 2015 the Court entered an order approving the employment of TransPerfect, Inc. ("TransPerfect") to collect additional data from the Defendants' computers located in Florida. [Dkt No. 644.] The Overall Receiver and his counsel have developed a plan to merge this additional data with the existing electronic documents to create a new and more functional database. In order to implement this new database, Overall Receiver obtained Court approval to expand TransPerfect's employment to process and host the new database. [Dkt No. 732] Subject to privilege issues, the Overall Receiver will make the documents available for review by the Plaintiff and the intervenors.

### Forensic Accounting

15. During the Reporting Period the Overall Receiver continued the task of recreating the Defendants' accounting records. After reviewing the Defendants' accounting records, the Overall Receiver determined that the accounting for cash activity was incomplete and could not be relied on to reflect the actual cash flow of the Defendants' various entities. The Overall Receiver has identified approximately sixty two (62) accounts at nine (9) different banks controlled by the Defendants from May 2013 through September 2014. Additionally, the Overall Receiver identified twenty one (21) bank accounts controlled by relatives or associates of the Defendants. A plan has been developed to identify those bank accounts that will require a detailed analysis and those bank accounts that will require a more limited review.

16. Prior to the appointment of the Overall Receiver, Grant Thornton, LLP ("Grant Thornton") was employed to trace the use of the Defendants' funds. However, Grant Thornton did not complete the work. The Overall Receiver, in consultation with the intervenors, decided that it was necessary to complete the tracing of the Defendants' cash in order to identify additional assets for recovery and to provide information requested by certain government agencies. On November 19, 2015 the Court entered an order approving a settlement with Grant Thornton on outstanding fees in exchange for all of their workpapers and supporting documentation. [Dkt No. 692.] After reviewing the documents provided to the Overall Receiver it was determined that many bank statements were missing or contained insufficient detail to support the cash transactions. The Overall Receiver, by subpoena, has requested additional information from several banks to obtain the missing information. Upon completion of the cash tracing analysis, the Overall Receiver will issue a comprehensive report detailing the use of funds obtained through the sale of the fraudulent loans.

**Overall Receiver Activity and Fees and Expenses**

17. The activities of the Overall Receiver are fully set forth in the Eighth Fee Statement of Overall Receiver and HRP for Allowance of Compensation and Reimbursement of Expenses for The Period of December 1, 2015 through December 31, 2015 ("Fee Statement"), which is attached as **Exhibit B**.

18. During the Reporting Period, the Overall Receiver and HRP provided 299.0 hours of professional services rendered to the Estates. In his Fee Statement, the Overall Receiver is seeking allowance of $72,983.50 in compensation for the Reporting Period and reimbursement of $440.62 for actual expenses incurred attendant to those services. (*See Exhibit B*).

I affirm under the penalty of perjury that the foregoing representations are true.

                                        HIGH RIDGE PARTNERS, INC.

Dated: January 25, 2016        By    /s/ Patrick Cavanaugh
                                                          Overall Receiver

Patrick Cavanaugh
High Ridge Partners, Inc.
140 South Dearborn Street,
Suite 420
Chicago, IL 60603
pcavanaugh@high-ridge.com