**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In Re:<br><br>FIRST FARMERS FINANCIAL LITIGATION. | |
| PATRICK CAVANAUGH, not individually but as the Receiver of the Overall Receivership Estate,<br><br>Plaintiff,<br><br>v.<br><br>BCM HIGH INCOME FUND, LP and BCM HIGH INCOME GP, LLC,<br><br>Defendants. | Case No. 1:14-cv-07581 |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE DEFENDANTS' AFFIRMATIVE AND OTHER DEFENSES**

Defendants BCM High Income Fund, LP, and BCM High Income GP, LLC (collectively, "BCM" or the "Defendants") submit this memorandum of law in opposition to the motion strike Defendants' affirmative and other defenses filed by Patrick Cavanaugh, not individually but as the Receiver for First Farmers Financial ("First Farmers" or "FFF") and the FFF Guaranty Fund I, LLC (the "Guaranty Fund") ("Plaintiff" or the "Receiver"). (ECF No. 1486, "Mot. to Strike".) Defendants will agree to withdraw their Thirteenth Affirmative Defense, but the Court should deny Plaintiff's request to strike Defendants' remaining defenses.

**ALLEGATIONS IN THE COMPLAINT & ANSWER**

The Receiver's claims arise from a fraud conducted by First Farmers and its owner, Nikesh Patel ("Patel"), on victims including Defendants. As a central feature of the scheme, First Farmers allegedly sold millions of dollars in fictional loans that were purportedly

guaranteed by the U.S. Department of Agriculture ("USDA") Rural Development Program. (Compl. ¶ 1.) As part of this scheme, First Farmers also allegedly invented "borrowers, printed phony loan documents, forged the signatures of USDA officials on guarantees, [and] sent fraudulent loan documentation" to buyers and loan financiers. (*Id.* ¶ 46.) The Receiver alleges that First Farmers sold 29 phony loans in the course of this scheme. As part of its scheme, First Farmers made phony principal and interest payments on behalf of the purported borrowers. (*See id.* ¶ 52.)

Pennant Management, which is in the business of investing in USDA-guaranteed loans on behalf of its clients through repurchase agreements, allegedly purchased 26 of First Farmer's phony loans. (*Id.* ¶ 7.) First Farmers sold the remaining three fraudulent loans to BCM for an aggregate purchase of $21.9 million (the "Fraudulent Loans"). On July 23, 2013, First Farmers repurchased the Fraudulent Loans from BCM through the Guaranty Fund, paying approximately $22.1 million for the loans. (*Id.* ¶ 51.) Neither Pennant nor its investors sold any of the phony loans they purchased. In September 2014, when First Farmer's scheme was finally revealed, and the loans were discovered to be worthless, Pennant's investors were allegedly left holding nearly $175 million in bogus loans. (*Id.* ¶¶ 46, 62.)

BCM alleges in its Answer and Affirmative and Other Defenses that it financed the $21.9 million purchase price for the Fraudulent Loans through its own repurchase agreement with Pennant. Through the agreement, Pennant's investors provided BCM with money to purchase the Fraudulent Loans. (*See* Ans., 7th Aff. Def.) In exchange for providing cash to BCM, Pennant, acting on behalf of its investors, purchased the Fraudulent Loans from BCM. When the Guaranty Fund repurchased the Fraudulent Loans, BCM used those funds to repurchase the Fraudulent Loans from Pennant and its investors. (*Id.*) As a result, BCM alleges that certain

investors, including creditors of the Receivership Estate, already received funds from the transfers that the Receiver alleges were fraudulent.

The Receiver asserts five causes of action against Defendants on behalf of First Farmers and the Guaranty Fund. Counts I and III seek to avoid the allegedly phony interest payments ("P&I Transfers") that FFF made to BCM and the transfer that Guaranty Fund used to repurchase the Fraudulent loans from BCM ("Repurchase Transfers") under Section 726.105(1)(a) of the Florida Uniform Fraudulent Transfer Act ("UFTA"), which allows a creditor to avoid a transfer that is made "with actual intent to hinder, delay or defraud any creditor of the debtor." (Comp. ¶¶ 65-74, 83-93.) Counts II and IV seek to avoid the same transfers under 726.105(1)(b) of the Florida UFTA under a theory of constructive fraudulent transfer, that is that the transfers were made "without receiving reasonably equivalent value in exchange for the transfer." (*Id*. ¶¶ 75-82, 94-101.) Finally, Count V asserts a claim for common law unjust enrichment, claiming that "BCM did not provide any value or consideration to First Farmers in exchange for receiving the benefits of the [transfers]" from First Farmers and the Guaranty Fund. (*Id*. ¶¶ 102-110.) For each cause of action, the Receiver seeks money damages and injunctive relief barring Defendants' from making distributions or redemptions to its investors or transfers, transfers outside the ordinary course of business, or any transfer "of any sort" to insiders. (*See id*. ¶¶ 74, 82, 93, 101, 110.)

## STANDARDS

Affirmative defenses will be stricken "only when they are insufficient on the face of the pleadings." *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989). Affirmative defenses are stricken only if it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense and are inferable

3

from the pleadings. *Williams v. Jader Fuel Co., Inc.*, 944 F.2d 1388, 1400 (7th Cir. 1991) (citations and internal quotation marks omitted). Accordingly, courts are typically reluctant to decide disputed or substantial issues of law on a motion to strike. *Van Schouwen v. Connaught Corp.*, 782 F. Supp. 1240, 1245 (N.D. Ill. 1991). Motions to strike are consistently disfavored because they consume scarce judicial resources, *Custom Vehicles, Inc. v. Forest River, Inc.*, 464 F.3d 725, 727 (7th Cir. 2006), and "potentially serve only to delay." *Heller Fin.,* 883 F.2d at 1294 (citation omitted).

## ARGUMENT

Defendants' first 12 defenses should not be stricken. Those defenses are adequately pleaded (in the defenses themselves or the Receiver's Complaint) and each one would defeat at least one of the Receiver's five causes of action.

**I.    The Court Need Not Strike Defendants' Negative Defenses.**

The Receiver contends that Defendants' Fourth, Eighth, Ninth, and Tenth Defenses are not affirmative defenses, because they merely negate an element of the Receiver's claim. Negative defenses, however, need not be stricken. *See, e.g.*, *Van Schouwen*, 782 F. Supp. at 1247. Courts in this district have declined to strike negative defenses because "striking such defenses does no good to anyone . . . [the plaintiff] scores no advantage because it must still face the denials which, it says, makes the affirmative defense redundant." *Id.*; *see also Kohler v. Island Rests. LP*, 280 F.R.D. 560, 567 (S.D. Cal. 2012) ("Negative defenses may also be raised in [the] answer."). The only practical distinction between a negative defense and affirmative defense is that affirmative defenses must be pleaded or they are waived. *See* Fed. R. Civ. P. 8(c). For that reason, "the cautious pleader is fully justified in setting up as affirmative defense anything that might possibly fall into that category." *Van Schouwen*, 782 F. Supp. at 1247 (quotations omitted).

4

Nevertheless, so long as the Court makes clear that the Receiver cannot assert a waiver for failure to plead any of these negative defenses, Defendants have no objection to filing an amended answer that excludes negative defenses.

## II. Defendants' First Affirmative Defense Is a Valid Defense Arising Under Rule 12(b)(6).

Defendants' First Affirmative Defense, which asserts that the Receiver has failed to state a claim, is a proper defense to raise in a pleading. *See*, *e.g.*, *Malibu Media, LLC v. Reeves*, 2013 WL 5487424, at *1 (S.D. Ind. Sept. 27, 2013) (declining to strike failure to state a claim from an answer because the defense specifically provided for under the Federal Rules). Rules 12(b)(6) and 12(h) permit a defendant to raise this defense in any pleading allowed under Rule 7(a), which includes an answer. *See* Fed. R. Civ. P. 12(h).

Here, Defendants deny most of the Receiver's allegations in their answer, but they also dispute that the Receiver would be entitled to recovery even if he can prove his well-pleaded factual allegations. The well-pleaded facts do not demonstrate that: the Receivership estates made transfers without receiving reasonably equivalent value; that Defendants did not act in good faith; or that BCM was unjustly enriched to the detriment of the receivership entities or its creditors.

## III. Unclean Hands and *In Pari Delicto* Are Proper Defenses to the Receiver's Unjust Enrichment Claims.

The Receiver's motion to strike Defendants' Fifth and Sixth Defenses should be denied because the doctrines of unclean hands and *in pari delicto* are valid equitable defenses to Count V (unjust enrichment). As the Receiver concedes, equitable defenses are generally applicable to claims of unjust enrichment. (*See* Mot. to Strike ¶ 19 ("[A]n unclean hands defense is generally available to defeat an otherwise legitimate unjust enrichment claim.").) Contrary to

5

the Receiver's suggestion, however, these equitable defenses are available against a court-appointed receiver, and the merits of these defenses will turn on questions of fact.

The Receiver brings his claims under Florida law. Florida courts have recognized that equitable defenses are applicable to unjust enrichment claims brought by a receiver and have even dismissed unjust enrichment claims brought by receivers on that very basis. *E.g.*, *Stermer v. Credit Exchange Corp.*, 2009 WL 1203928, at *1 (S.D. Fla. May 1, 2009) (dismissing unjust enrichment claims brought by receiver as barred by *in pari delicto*); *see also In re Wiand*, 2007 WL 963165 (M.D. Fla. Mar. 27, 2007) (recognizing that *in pari delicto* applies to a receiver's unjust enrichment claims); *In re Skyway Comms. Holdings Corp.*, 389 B.R. 801 (M.D. Fla. 2008) (recognizing that *in pari delicto* applies to a trustee's unjust enrichment claims).

The Receiver relies on *Scholes v. Lehmann*, 56 F.3d 750, 753–54 (7th Cir. 1995) and its progeny to argue that unclean hands and *in pari delicto* cannot apply to a court-appointed receiver because the receivership entities have been "cleansed" of wrongdoing. (*See* Mot. to Strike ¶¶ 19, 22.) In Florida, however, courts do not "separate the fraud and intentional torts of insiders from the corporation itself" when "the entities in receivership do not include a corporation that has at least one honest member of the board of directors or an innocent investor." *In re Wiand*, 2007 WL 963165, at *7 (M.D. Fla. 2007). In fact, some courts apply *in pari delicto* to receivers without engaging in any such analysis based on the principal that a receiver stands in the shoes of the corporation. *See Stermer*, 2009 WL 1203928, at *1.

Here, the Receiver alleges that First Farmers was owned by Patel and Timothy Fisher and that they used First Farmers to engage in fraud from its inception, by conspiring to defraud the USDA, and fraudulently securing loans to purchase real estate, before creating and selling at least 29 fictitious loans. (Compl. ¶¶ 24-25.) Accordingly, under Florida law, the misconduct of

6

Patel, First Farmers, and the Guaranty Funds can defeat the Receiver's equitable claims against BCM. Therefore, Defendants' Fifth and Sixth Defenses should not be stricken.

## IV. The Defendants' Third, Seventh, and Eleventh Defenses Assert Valid Defenses to the Receiver's Claims.

Defendants' Third Affirmative Defense asserts that Defendants did not have actual or constructive knowledge of First Farmers' or the Guaranty Fund's fraud, and their Seventh and Eleventh Affirmative Defenses assert a right to setoff, recoup, or offset any allegedly fraudulent transfers based on any monies paid to the receivership entities, any claims Defendants have against the Receivership entities, or the amount of any of allegedly fraudulent transfers that were already paid to creditors of the receivership entities.

It is well settled that a defendant who is fraudulently induced into investing in a Ponzi scheme, which the Receiver alleges First Farmers was operating, is not liable for constructive fraudulent transfer up to the amount of his restitution claim if the defendant does not have actual knowledge of the fraud. *See In re M&L Bus. Mach. Co., Inc.*, 84 F.3d 1330 (10th Cir. 1996) (where the transferee "did not have actual knowledge of the fraud," he "has a colorable claim to recover the amounts that he invested in the [scheme]"); *In re Lake States Commodities, Inc.*, 253 B.R. 866 (N.D. Ill. 2000) (for purposes of constructive fraudulent transfer, "reasonably equivalent value" is given for transfers to parties without knowledge of the fraud because they have valid restitution claims against the estate); *In re Prebul Jeep, Inc.*, 2009 WL 4581900 (E.D. Tenn. Nov. 30, 2009) (same) (applying Tennessee law).

Contrary to the Receiver's arguments, Defendants need not prove good faith to satisfy this defense. To prevail on his constructive fraudulent transfer claim, the Receiver must prove that the transfers at issue were made by the receivership entities "[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation." Fl. Stat. § 726.105(1)(b).

7

It is well settled that transfers are made for reasonably equivalent value if they "reduce claims for restitution held (knowingly or not) by the victims" of a fraud. *In re Prebul Jeep*, 2009 WL 4581900, at \*4; *see also In re Lake States*, 253 B.R. at 880 (if the transferee has a colorable claim of restitution, "the Trustee would have the burden of proving that the claim for restitution provided less than reasonably equivalent value"). Accordingly, Defendants are entitled to assert as a defense that they were not aware of First Farmers' fraud and the court should reduce any liability by the amount of Defendants' claim against First Farmers and Patel.

Defendants' Seventh Defense also alleges that the Repurchase Transfer and portions of the P&I Transfers were ultimately paid to Pennant's investors, including creditors of the receivership entities. These allegations, if proven, would defeat the Receiver's unjust enrichment claim. To prevail on that claim, the Receiver must prove that BCM accepted or retained a benefit and that the circumstances are such that it would be unjust for the defendants to retain the benefit. *Golden v. Woodward*, 15 So. 3d 664, 670 (Fl. Dt. Ct. App. 2009).

Thus, by alleging that it did not retain the Repurchase Transfer or the P&I Transfers, BCM has introduced additional facts, not found in the Receiver's Complaint, that demonstrate it did not accept or retain a benefit. In addition, by alleging that creditors of the estate received some of those transfers, BCM has pleaded additional facts that would defeat the Receiver's allegation that it would be unjust if BCM is not required to pay the transfers back to FFF. In fact, it would be patently inequitable to wrench money from BCM's innocent investors to provide creditors with what, in effect, would be a double recovery.

The Receiver's reliance on the Bankruptcy Code to limit Defendants' setoff and recoupment defenses is misplaced. Setoff in an equity receivership is a matter of discretion of the Court, guided by principles of equity. *See generally SEC v. Elliot*, 953 F.2d 1560 (11th Cir.

8

1992) ("The district court has discretion whether to allow a setoff against a receiver, and this decision will not be overturned for an abuse of discretion.") (applying Florida law).

In *Elliot*, the Eleventh Circuit reversed the district court's denial of a setoff claim by a defrauded investor against a receiver. *Id*. at 1573–74. There, the defendant held a $1 million unsecured claim for restitution against the receiver, which the receivership plan would pay a mere $70,000. *Id*. at 1572. The receiver sought to recover $280,000 from the investor for a loan owed by the investor to the debtor. *Id*. The district court denied setoff of these debts because it would create a preference over other creditors by allowing this investor to receive a dollar-for-dollar return on this investment up to the $280,000. *Id*. On appeal, the Eleventh Circuit reversed, explaining that "[d]espite having the effect of a preference, a setoff is a long-recognized right and is generally favored." Even in "the special circumstances of mass fraud with hundreds of defrauded creditors," setoff "must be examined individually to determine the rights of that individual." *Id*. The court determined that it was legally relevant that the defendant was using setoff as a shield rather than a sword: "[a]lthough claimants were not permitted to trace into the receivership based on equitable theories of fraud, it is appropriate to permits [defendant] to raise the defense of fraud . . . [where] the Receiver is reaching out to pull money *into the fund*." *Id*. at 1574 (emphasis added). Ultimately, the court remanded for the district court to weigh the equities to determine whether setoff should be permitted. *Id*. at 1575.

In this case, as in *Elliot*, the Receiver is attempting to pull money into the fund, so he is subject to Defendants' equitable doctrines of setoff and recoupment, and the Court must weigh the equities after considering all of the circumstance to determine whether and to what extent to

9

allow setoff. *Id*. at 1572.[1]  Defendants have alleged a host of equitable reasons why setoff should be allowed as well as damages that arose from the fraud that are of different character than the other creditors of estate.  (*See generally*, Ans., 7th Aff. Def.)  Because a motion to strike is obviously not a suitable juncture for the Court to decide these factual issues or weigh the relative equities, the Seventh and Eleventh Defenses should not be stricken.

The bankruptcy cases cited by the Receiver denying setoff against a trustee's fraudulent transfer claim do not compel a different result.  (*See* Mot. to Strike ¶¶ 24-25 (citing cases).)  In bankruptcy, the debts are not "mutual" because a fraudulent conveyance claim by a trustee is not a pre-petition debt, but rather a debt owed to the trustee by operation of the Bankruptcy Code. *See, e.g.*, *In re Singh*, 434 B.R. 298, 308 (E.D.N.Y. 2010).  In contrast, the Florida UFTA does not grant any special rights to a receiver upon appointment, and, accordingly, does not provide a basis for the Receiver to assert that these claims arise post-appointment.  Indeed, none of the cases cited by the Receiver supports his assertion that a court overseeing an equitable receivership has no discretion to grant setoff against a fraudulent transfer claim where equity supports such relief.[2]  *See Elliot*, 953 F.2d at 1572 (setoff in receivership is "governed by equity jurisprudence"); *cf. S.E.C. v. Mgmt. Sols., Inc.*, 2016 WL 4821275, at *10 (D. Utah Sept. 9,

---

[1] The Receiver's motion does not even consider, for example, the destructive impact that disallowing setoff of, at a minimum, BCM's pro rata share of the estate.  Rather under his approach, BCM would be required to liquidate substantially all of its investors' assets to pay the Receiver on his fraudulent transfer claims immediately, just so that he can hold onto those funds until he is ready to formally distribute BCM's pro rata share.  There is no statute or rule that requires the court to damage BCM's innocent investors by following the procedure the Receiver describes.

[2] *U.S. v. Arizona Fuels Corp.*, 739 F.2d 455, 457–58 (9th Cir. 1984) is inapposite.  In that case, the question was whether the defendant could unilaterally setoff pre-appointment debts using funds from a large prepayment made by the entity just prior to appointment.  *Id*. at 457.  The court determined that the contractual right of setoff in that case was not automatic and because the receivership succeeded to the rights in the prepayment upon appointment, the defendant could not unilaterally setoff pre-receivership debts with the payment after the appointment.  *Id*. at 458.  BCM is not in possession of any receivership assets, so *Arizona Fuels* has no force.

2016) (refusing to strictly apply mutuality rules to setoff dispute with receiver, concluding that "the district court is authorized and expected to determine claims in an equity receivership based on equitable, rather than formalistic, principles").

Finally, the Claims Bar Order also does not preclude BCM from raising defenses an claims that would offset any recovery that the Receiver might be able to establish. Defendants do not seek any payment from the Receiver or the receivership entities. Instead, they are seeking to reduce the amount of any judgment. Courts have long held that "a party otherwise barred from instituting an action because of a time limitation is freed from that bar when he acts in a defensive posture." *Allie v. Ionata*, 503 So. 2d 1237, 1239 (Fla. 1987) (quotations omitted); *see also Wood v. Cannon Cty.*, 166 S.W.2d 399, 401 (Tenn. App. 1942) ("[T]he statute of limitations does not run against a matter which arises out of plaintiff's cause of action and which is setup as a recoupment or defense."). Bankruptcy courts have likewise allowed defendants to assert setoff as a defense regardless of whether they have filed a timely proof of claim. *See, e.g.*, *In re G.S. Omni Corp.*, 835 F.2d 1317, 1319 (10th Cir. 1987); *Bernstein v. IDT Corp.*, 76 B.R. 275, 281 (S.D.N.Y. 1987) ("A creditor may be content not to file such a claim as long as no affirmative relief is sought from it by the bankrupt, but once the Trustee asserts a claim against the creditor, equity requires that the creditor be permitted to assert authorized counterclaims.")

V.  **The Existence of a Valid Contract Is a Valid Defense to the Receiver's Unjust Enrichment Claims.**

The Receiver also moves to strike Defendants' Twelfth Defense which alleges that the "[t]he Overall Receiver's unjust enrichment claims are barred by express contracts governing the subject matter of those claims." (Ans. ¶ 47.) In Florida, a claim for unjust enrichment "is an equitable claim based on a legal fiction which implies a contract as a matter of law even though the parties to such an implied contract never indicated by deed or word that an agreement existed

11

between them." *14th & Heinberg, LLC v. Terhaar Croney General Contractors*, 43 So. 3d 877, 880 (Fl. Dist. Ct. App. 2010). As such, the existence of an express contract governing the subject matter of the claim may defeat a claim of unjust enrichment. *See Corn v. Greco*, 694 So.2d 833, 835 (Fla. Dist. Ct. App. 1997) ("[T]he legal fiction of an implied contract . . . cannot be maintained, however, when the rights of the parties are described in a written contract.").

The Receiver's Complaint alleges that First Farmers made interest payments to BCM pursuant to loan documents and that BCM agreed with Patel to sell the loans back to the Guaranty Fund in exchange for $22.1 million. Thus, the Receiver has already alleged the existence of contracts governing the transfers at issue. Because these allegations must be taken as true and state a valid defense to the Receiver's claims, Defendants' Twelfth Defense should not be stricken.[3]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny the Receiver's Motion to Strike Defendants' Affirmative and Other Defenses.

Dated: July 17, 2017  Respectfully submitted,

/s/ *Brian J. Poronsky*
Brian J. Poronsky
J Matthew Haws
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL  60661
Telephone:  (312) 902-5200
brian.poronsky@kattenlaw.com
matthew.haws@kattenlaw.com

Anthony L. Paccione (*pro hac vice*)

---

[3] Federal Rule of Civil Procedure 8(d)(3) allows defendants to plead this defense in the alternative while also alleging equitable defenses to the Receiver's unjust enrichment claims.

12

            KATTEN MUCHIN ROSENMAN LLP
            575 Madison Avenue
            New York, NY 10022
            Telephone: (212) 940-8800
            anthony.paccione@kattenlaw.com

**CERTIFICATE OF SERVICE**

  I, J Matthew Haws, an attorney in this matter, hereby certify that on July 17, 2017, I caused a copy of the foregoing to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

                  /s/ *J Matthew Haws*