**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | No. 14-cv-7581 |
| FIRST FARMERS FINANCIAL | ) | |
| LITIGATION | ) | Hon. Amy J. St. Eve |
| | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

The matter before the Court concerns the claims of Patrick Cavanaugh (the "Overall Receiver"), not individually, but in his capacity as receiver of the Overall Receivership Estate for First Farmers Financial, LLC ("FFF") and FFF Guaranty Fund I, LLC (the "Guaranty Fund"), against Defendants BCM High Income Fund, LP ("BCM") and BCM High Income GP, LLC ("BCM GP") (collectively, "Defendants") under the Florida Uniform Fraudulent Transfer Act ("FUFTA") and the doctrine of unjust enrichment. (*Cavanaugh v. BCM High Income Fund, LP*, No. 17-cv-3263, Dkt. No. 1 (N.D. Ill. 2017).)[1] Currently before the Court is the Overall Receiver's Motion for a Preliminary Injunction. (Dkt. 7.) For the following reasons, the Court denies the Overall Receiver's motion.

## BACKGROUND

### I.      The Genesis of the FFF Fraudulent Scheme

This case arises out of the massive Ponzi scheme that Nikesh Patel ("Nikesh")—among others—orchestrated through FFF. (Dkt. 8-1, Overall Receiver Decl., ¶ 7.) A victim of Nikesh's scheme uncovered the fraud in September 2014, and, shortly thereafter, the United States

---

[1] The Overall Receiver's current action against Defendants was consolidated under the *In re First Farmers Financial Litigation* case number on May 5, 2017. The complaint, motion for a preliminary injunction, and memorandum in support of the motion are filed under the original case number, cited above. The Court cites to this docket with the abbreviation "Dkt." The Court cites to the *In re First Farmers Financial Litigation* docket with the abbreviation "R."

Attorney for the Northern District of Illinois initiated criminal proceedings against Nikesh. (*Id.* at ¶¶ 36–39.) In December 2016, Nikesh pled guilty to five counts of wire fraud. (*Id.* at ¶¶ 38–39); *United States v. Patel*, 14-cr-546, Dkt. 65 (N.D. Ill. Dec. 6, 2016). Nikesh's sentencing is currently scheduled for August 29, 2017 before the Honorable Charles Kocoras. *Patel*, Dkt. 90 (N.D. July 31, 2017). Nikesh's plea declaration indicates that his counsel believes his U.S. Sentencing Guidelines range is 360 months to life in prison. *Id.*, Dkt. 66 at 8 (Dec. 6, 2016).

Nikesh owned a 50% stake in FFF and, "at all relevant times, was the managing member of FFF, and served as FFF's President and Chief Executive Officer." (Dkt. 8-1 at ¶ 8.) Broadly speaking, Nikesh used FFF "to fraudulently obtain millions of dollars by purchasing real estate properties with straw buyers and from the sale of fictional loans that were purportedly guaranteed either by the U.S. Small Business Administration ('SBA') or the U.S. Department of Agriculture ('USDA') Rural Development Program." (*Id.* ¶ 7.)

By January 2012, Nikesh and his co-owner of FFF, Timothy Fisher, "initiated the process of securing USDA approval of FFF as a non-traditional lender" through fraud. (*Id.* at ¶¶ 8–10.) During the approval process, Nikesh put his Ponzi scheme in motion by acquiring a property in Orlando, Florida (the "7411 Property") using a straw buyer, Medical Investment Holdings III, LLC ("MIH"). (*Id.* at ¶ 11.) In purchasing the 7411 Property, Nikesh and his associates used a forged letter on Wells Fargo letterhead to misrepresent that MIH had $1.5 million in a Wells Fargo deposit account. (*Id.* at ¶ 12.) They then arranged for Legence Bank to purchase a $2 million participation in a fictitious $2.5 million bridge loan from FFF to MIH (the "First Fraudulent MIH Loan"). (*Id.*) Unbeknownst to Legence Bank, MIH needed only $608,000 of the $2,000,000 to buy the 7411 Property. (*Id.* at ¶ 13.) Nikesh pocketed the approximately $1.4 million difference and used it to invest in hotel properties and continue the FFF fraud. (*Id.*)

Shortly thereafter, Nikesh needed additional funds to pay off the $2 million dollar bridge loan from Legence Bank to keep his scheme afloat.  (*Id.* at ¶ 14.)  He obtained another short term loan for $1.8 from WingFinance, LLC, replacing Legence Bank as a lender.  (*Id.*)  Nikesh's relationship with BCM began when he was in search of cash to pay off the WingFinance loan.  (*Id.*)

## II.      BCM and the Business of Buying and Selling USDA-Guaranteed Loans

BCM GP is a general partner of BCM that makes the operational decisions for BCM.  (R. 1457-1, Banes Decl., ¶ 4.)  BCM has approximately 54 limited partners, who are primarily individuals rather than institutional investors.  (*Id.*)

BCM "invests in the portion of USDA or SBA loans that are guaranteed by the U.S. government."  (*Id.* at ¶ 5.)  The guaranteed portion of USDA loans trade in a "robust secondary market" that is "crucial to the USDA loan program because it allows lenders to leverage their capital base by selling loans quickly after origination and re-using the funds to make new loans," thereby allowing "more borrowers to take advantage of the program."  (*Id.* at ¶ 7.)  Joel Banes, who owns 80% of BCM GP,[2] indicates that "[t]he fact that the loans are guaranteed by the USDA allows investors and traders in the secondary market to purchase loans while conducting minimal diligence into the lender and borrower."  (*Id.* at ¶¶ 4, 8.)  He further states that "[b]ecause the loan is guaranteed by the full faith and credit of the United States, the credit profile of the borrower is irrelevant to traders like [BCM]."  (*Id.*)  Additionally, he says that the credit profile of the loan originator is irrelevant to a trader in the secondary market because there "is no credit risk in buying a loan from an originating bank and, in any event, the U.S. government guarantees the underlying loan."  (*Id.* at ¶ 9.)  Furthermore, the "U.S.

---

[2] Banes also owns 50% of Banes Capital Management, which is BCM's investment advisor and the manager of BCM's investments.  (R. 1457-1 at ¶¶ 3–4.)

Government . . . must approve any non-traditional lenders . . . before the lender can participate in the USDA Guarantee Program." (*Id.* at ¶ 10.) Thus, "it is not [BCM's] practice to conduct due diligence on the lender." (*Id.* at ¶ 9.)

BCM generates returns for its investors in two ways. First, it buys and then sells loan at a small profit. (*Id.* at ¶ 11.) Second, it "capitalizes on an interest arbitrage during the loans' holding period because the loans pay an interest rate that exceeds BCM's interest expense." (*Id.*) BCM seeks to purchase newly-originated loans because older loans carry a greater risk of default and because the premium BCM may receive for selling a loan declines as the loan gets closer to maturity. (*Id.*) Consequently, BCM "does not hold loans to maturity." (*Id.*) Banes says that three to six months is a "reasonable time frame in which to hold and sell a loan," although BCM may hold loans for a shorter or longer period. (*Id.* at ¶ 12.) Throughout its existence, BCM has bought and sold thousands of the guaranteed portions of USDA and SBA loans. (*Id.* at ¶ 5.)

Before the discovery of the FFF fraud, Banes Capital Group—which provides administrative services to Banes Capital Management, which in turn is BCM's investment adviser and investment manager—"followed the 'Good Delivery Requirements' as established by the Bond Market Association." (*Id.* at ¶¶ 3–4, 15; Monaco Decl., R. 1457-2, ¶ 4.) Based on these requirements, BCM would receive the following when it would purchase loans: (1) an original USDA Assignment Guarantee Agreement, (2) a copy of the note, (3) a copy of the USDA Loan Note Guarantee, and (4) a prepayment pass-through letter indicating that when the loan is sold, the prepayment penalty will pass through to the purchaser of the loan on a pro-rata basis. (R. 1457-2 at ¶ 4.) BCM also would receive a Letter of Attestation, which, among other things, certified that the provided information is true. (*Id.*) Banes says that other industry leaders followed the same procedures. (R. 1457-1 at ¶¶ 19–20.) Additionally, although the

USDA "at one time created a form, known as a Certificate of Incumbency, on which a representative of the USDA verified the authenticity of the signatures of the Loan Agreement, the Assignment, and the Guarantee," Banes says that "[s]ince 2001, it has not been industry practice to require a Certificate of Incumbency from the USDA to settle loans." (*Id.* at ¶ 18; *see also id.* at ¶ 19.) Matthew Monaco, a Banes Capital Group trader, agrees with Banes. (R. 1457-2 at ¶¶ 3, 7.) He references an unsolicited inquiry from Signature Bank asking whether industry participants require a Certificate of Incumbency, to which an employee from First Tennessee Bank, "one of the largest players in the market," responded: "[Certificates of Incumbency] have not been required in the Secondary Market since 2001. We do not require or ask for them. Even if we receive one (hardly ever), we don't include them in the document packages to our investors." (*Id.* at ¶ 8.) With respect to contacting the USDA to confirm loan authenticity, Monaco and Banes represent that BCM did not do this before discovery of the FFF fraud, nor are they aware of any other industry participant that behaved differently during that time. (*Id.* at ¶ 9; R. 1457-1 at ¶ 21.)

### III.    BCM's Relationship with FFF

BCM entered the picture when Nikesh sought to pay off the WingFinance short-term loan to keep his fraudulent scheme above water. (Dkt. 8-1 at ¶ 14.) The Overall Receiver and Nikesh agree that Nikesh targeted BCM to buy his fictitious loans because of BCM's "lax due diligence procedures." (*Id.* at ¶ 15; Dkt. 8-3, Nikesh Decl., ¶ 8.) Nikesh intended to sell fictitious USDA-guaranteed loans, but feared someone would discover his fraud if they were sold or marketed on the secondary market. (Dkt. 8-3 at ¶ 5.) He therefore wished to find a lender "that would be willing to hold USDA guaranteed loans instead of breaking them up into pieces and selling them on the secondary market." (*Id.*) According to Nikesh, he "contacted many potential lenders and

secondary market broker-dealers in the industry, . . . but they were unwilling to hold loans" and required "a seven-day lead time before funding." (*Id.*) Additionally, he claims one lender, Cantor Fitzgerald, "had an extensive list of required documents before funding." (*Id.*)

Nikesh first met BCM representatives around May 2012 at a convention and then later had conversations with Matthew Monaco regarding BCM's funding requirements. (*Id.* at ¶¶ 6–7.) Nikesh was "surprised and pleased to learn that BCM was willing to fund transactions within a day or two." (*Id.* at ¶ 7.) Nikesh also says that he "knew BCM did not send notices of assignments to the USDA and knew that BCM's due diligence process was not extensive, particularly in light of its willingness to engage in next-day funding transactions." (*Id.*) In October 2012, Nikesh approached Monaco regarding a fictitious $10 million loan with a 90% USDA guaranty (the "Second Fraudulent MIH Loan"). (*Id.* at ¶ 8.) Nikesh sent Monaco an email indicating that he did not want to sell the loan, but instead wished "to park it somewhere for about 60 days while [he] finalize[d]" the acquisition of a property. (*Id.*)

BCM declined to agree in a contract to "park" the loan (R. 1457-2 at ¶ 16; R. 1457-1 at ¶ 28.) Nikesh says that Monaco told him not to make such requests in writing, and that BCM could, as a work-around, buy the Second Fraudulent MIH Loan and hold it for him though they could not agree in writing to do so. (Dkt. 8-3 at ¶ 9.) Monaco says that he told Nikesh that BCM would not commit to selling the loan back to FFF, but would hold off from selling it immediately to give FFF a chance to buy it back, as this "was consistent with the Fund's investment strategy." (R. 1457-2 at ¶ 16.) Banes indicates that although FFF would not agree to "park" a loan, he "did not find" Nikesh's request suspicious, as "there are many legitimate reasons why an originating lender would want to repurchase its loans on the secondary market." (R. 1457-1 at ¶ 29 (enumerating reasons).) Banes further explains that he recalls at least one loan that BCM bought

in November 2013 and sold back to the originating lender in February 2014.  (*Id.* at ¶ 30.)

Additionally, he says that Nikesh's request was "consistent with [his] understanding of the

business cycle of USDA . . . lenders" because originating lenders, particularly new ones, "often

do not have sufficient capital to hold a large number of loans while at the same time continuing

to originate new loans."  (*Id.* at ¶ 31.)  Indeed, Banes says, the "USDA encourages lenders to sell

loans so that they can free up capital to originate new loans," and that it is "logical . . . that a

lender might choose to sell a loan when made to free up capital to make more loans."  (*Id.* at

¶ 34.)

BCM acquired the fictional guaranteed portion of the Second Fraudulent MIH Loan on

November 16, 2012 for about $10 million.  (Dkt. 8-1 at ¶ 17; Dkt. 8-3 at ¶ 11.)  In addition to

this loan, BCM purchased four legitimate USDA-guaranteed loans from FFF along with two

other fictional loans.  (Dkt. 8-1 at ¶ 18.)  BCM bought the four legitimate loans for a total of

$20,042,500 over the course of thirteen months and sold them for a premium within, at most,

nearly 10 weeks of acquisition.  (R. 1457-1 at ¶ 25; Dkt. 8-1 at ¶ 18.)  BCM bought the two other

fictitious loans on March 4, 2013 and March 28, 2013 for a total of about $12 million.  (*See* R.

1457-2 at ¶ 21; Dkt. 8-3 at ¶ 11; Dkt. 8-1 at Ex. 2.)  Nikesh says he sold the loans with the "same

'handshake' understanding that [BCM] would hold them for [Nikesh] and sell them back to

[Nikesh] at a later date."  (Dkt. 8-3 at ¶ 11.)

The Overall Receiver asserts that Banes and BCM became suspicious in May 2013

because "Nikesh had failed to follow through on his prior representation that he would buy back

the Fraudulent BCM Loans fairly soon after he sold them to BCM."  (Dkt. 8-1 at ¶ 22.)

According to Nikesh, in May 2013, he received a call from Monaco and Scott Taylor, another

BCM representative, in which Taylor told Nikesh that if was "going to repurchase [the loans],

[he] had better do it soon," as other investors had an interest in purchasing them.  (Dkt. 8-3 at

¶ 13.)  Nikesh says that Taylor "was obnoxious and nasty," but that Banes told him not to worry

about Taylor, but to buy the loans back quickly.  (*Id.*)  According to Nikesh, who did not have

the cash available to buy back the loans, he attempted to buy more time by, in May 2013,

investing $500,000 of his own funds in BCM and, in June 2013, by sharing the funding of a

legitimate USDA-guaranteed loan with a Texas bank that had a relationship with BCM.[3]  (*Id.* at

¶¶ 14-15; Dkt. 8-1 at ¶¶ 23–24.)  Additionally, Nikesh made monthly payments to BCM through

July 31, 2013 totaling $547,000.  (Dkt. 8-1 at ¶ 30.)  Banes represents that BCM had simply

become "more interested in selling the [fraudulent] loans because" of its standard practice to

monitor the age of loans and try to resell them within six months.  (*See* R. 1457-1 at ¶ 38.)

Banes and Monaco deny that they used a threatening tone with Nikesh.  (*See id.*; R. 1457-2 at

¶ 23.)

    According to the Overall Receiver, in May 2013, Banes introduced Nikesh to Pennant

Management ("Pennant"), another potential purchaser of USDA-guaranteed loans.  (Dkt. 8-1 at

¶ 25.)  According to the Overall Receiver, "[a]lthough Pennant served as a financing source for

BCM, in many ways BCM and Pennant were also competitors, as they both would compete to

purchase USDA-guaranteed loans."  (*Id.*)  Banes claims that introducing Patel to Pennant was

not unusual because "Patel mentioned that he was paying high interest rates to the Bank of

Montreal to finance loans," and Banes believed Pennant could provide FFF a better rate.  (R.

1457-1 at ¶ 43(e).)  Additionally, Banes says that Pennant is not a competitor of BCM, as BCM

buys and sells loans to make a profit while Pennant "only purchases USDA loans as part of

---

[3] The Overall Receiver says that Banes asked Nikesh to share the funding of the Texas bank's loan.  (Dkt. 8-1 at
¶ 24.)  Banes denies this assertion.  (R. 1457-1 at ¶ 43(b).)  Nikesh claims that "[he] *reached out* to Taylor and
*offered* to share the funding of" the Texas bank's loan.  (Dkt. 8-3 at ¶ 15 (emphasis added).)

repurchase agreements, which, although they are actual purchases and sales, effectively allow Pennant to lend money with USDA loans as collateral." (*Id.*) Banes says he believed "that FFF was an up-and-coming lender and could be a good source of new guaranteed loans with prepayment penalties." (*Id.*) Thus, he thought "introducing Patel to Pennant would help generate additional good will." (*Id.*)

Pennant was in the business of using its clients' funds to acquire, though a secondary market, USDA guaranteed loans originated by third-party lenders. (Dkt. 8-1 at ¶ 26.) Unlike BCM, which generally would sell loans it acquired, Pennant generally held loans it acquired and received principal and interest payments from the borrowers. (*Id.*) Between May 2013 and through August 2014, FFF sold Pennant's clients 26 fictitious loans purportedly guaranteed by the USDA for a total of $174.8 million. (*Id.* at ¶ 29, Ex. 4.)

In July 2013, FFF, with the proceeds generated by sales of loans to Pennant, was at last able to repurchase the three fraudulent loans from BCM. (*Id.* at ¶ 30; Dkt. 8-3 at ¶ 16.) According to Nikesh, Banes "suggested that [Nikesh] form a special purpose entity to be the buyer of the Fictional Loans" because "[n]either Banes nor [Nikesh] wanted to trigger any suspicions from Pennant by having FFF repurchase the loans." (Dkt. 8-3 at ¶ 16.) Nikesh has no documentation to support this assertion, and Banes says "[he] never suggested that FFF form a special purpose entity to repurchase any loans." (R. 1457-1 at ¶ 41.) On July 31, 2013, the special purpose entity Nikesh had created—FFF Guaranty Fund I, LLC—repurchased the fraudulent loans for $22.1 million. (Dkt. 8-1 at ¶ 33.)

## IV.    BCM's Financial Condition

The Overall Receiver indicates that as of December 31, 2015, BCM reported that it owned $459 million in investments, had repurchase agreement obligations exceeding $427, and

had partners' capital totaling $39.5 million. (*Id.* at ¶ 35.) As of the end of March 2017, however, the Overall Receiver says that BCM's partners' capital "has decreased from its December 31, 2015 levels." (*Id.*)

Banes claims that the "BCM Fund is financially healthy." (R. 1457-1 at ¶ 45.) He indicates that BCM had a total partner capital of approximately $31 million as of April 30, 2017, and that although the loss of Pennant's financing caused a setback, it has largely recovered. (*Id.*) Indeed, "so far in 2017, the fund is up 4.82 percent, (an annualized rate of 15.5%)," and that although BCM's "total partner capital has decreased since December 31, 2015, nearly half of that reduction in value was the result of revaluation of the fund's assets in August 2016." (*Id.*) At that time, BCM "switched from an amortized cost accounting method to a 'mark-to-market' accounting method, which caused its existing assets to be devalued by more than $4 million." (*Id.*)

## V.     The Current Litigation

The Overall Receiver filed suit against Defendants on May 1, 2017. (Dkt. 1.) Based on the transfer of principal and interest payments from FFF to BCM as well as FFF's repurchase of the three fraudulent loans, the Overall Receiver brings claims for actual fraudulent transfer under FUFTA, Fla. Stat. § 726.105(1)(a), constructive fraudulent transfer under FUFTA, Fla. Stat. § 726.105(1)(b), and unjust enrichment. (*Id.*) The same day he filed the complaint, the Overall Receiver moved for a preliminary injunction seeking an order:

> (a) enjoining the Defendants from making or allowing: (i) any investor redemptions or other distributions of any kind from BCM to its limited partners or equity holders; (ii) any transfers not in the ordinary course of Defendants' business; (iii) any transfers of any sort to insiders of Defendants; and (iv) any transfers in excess of $10,000 per transfer or $50,000 per week without prior leave of court; (b) requiring Defendants to provide the Overall Receiver with reasonable financial information on a monthly basis to verify

> compliance with such injunction and (c) granting such further
> relief as the Court deems appropriate.

(Dkt. 7 at 6.)

The Overall Receiver moved for an injunction the same day he filed this lawsuit. (Dkt. 7.) The parties indicated orally at a status hearing that a hearing is not necessary for the resolution of the motion.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy" and is "never awarded as a matter of right." *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017). Accordingly, courts may only issue a preliminary injunction "upon a clear showing that the plaintiff is entitled to relief." *D.U. v. Rhoades*, 825 F.3d 331, 339 (7th Cir. 2016) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Am. Guardian Warranty Servs., Inc. v. JCR-Wesley Chapel, LLC*, No. 16 C 11407, 2017 WL 2224883, at *8 (N.D. Ill. May 22, 2017). To obtain a preliminary injunction, the moving party must show (1) its claims have some likelihood of success on the merits; (2) it will suffer irreparable harm prior to the final resolution of its claims; and (3) traditional legal remedies are inadequate. *See Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1058 (7th Cir. 2016); *D.U.*, 825 F.3d at 335.

If the moving party meets the three prongs above, the Court must then "engage in a balancing analysis, to determine whether the balance of harm favors the moving party or whether the harm to other parties or the public sufficiently outweighs the movant's interests." *Whitaker*, 858 F.3d at 1044. This balancing inquiry is done on "'a sliding scale' . . . [that] measure[es] the balance of harms against the moving party's likelihood of success." *Id.* at 1054; *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015). "The more likely [the movant] is to

succeed on the merits, the less the scale must tip in [its] favor." *Whitaker*, 858 F.3d at 1054. Conversely, "the less likely [the movant] is to win, the more the balance of harms must weigh in [its] favor for an injunction to issue." *Id.* The Seventh Circuit will review legal issues de novo, factual findings for clear error, and the decision whether or not to issue an injunction for abuse of discretion. *Id.* at 1044; *see also Harlan v. Scholz*, -- F.3d --, 2017 WL 3327061, at *3 (7th Cir. 2017). "Substantial deference is given to the district court's 'weighing of evidence and balancing of the various equitable factors.'" *Id.* (quoting *Turnell*, 796 F.3d at 662); *see also Jones*, 842 F.3d at 1059-60 (noting that the weighing of the equitable factors in a preliminary injunction analysis is a "classic discretionary decision" for a district court (quoting *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1436 (7th Cir. 1986))).

## ANALYSIS

### I.      Likelihood of Success on the Merits

The moving party "need not show a likelihood of absolute success on the merits." *Whitaker*, 858 F.3d at 1046. "Instead, [the movant] must only show that [its] chances to succeed . . . are 'better than negligible.'" *Id.* (quoting *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999)). "This is a low threshold." *Id.* The movant, however, must clear this threshold if the Court is to consider the additional factors. *See D.U.*, 825 F.3d at 338; *Curtis v. Thompson*, 840 F.2d 1291, 1296 (7th Cir. 1988) ("[W]here the plaintiff is unable to establish this minimum threshold [of showing at least a better than negligible chance of success], the harm to the plaintiff will never override his failure to establish a likelihood of success.").

The Overall Receiver has alleged actual and constructive fraudulent transfer and unjust enrichment based on the principal and interest payments FFF made to BCM as well as the Guaranty Fund's repurchase of the three Fraudulent Loans. A fraudulent transfer action "is

either an action by a creditor against a transferee directed against a particular transaction, which, if declared fraudulent, is set aside thus leaving the creditor free to pursue the asset, or it is an action against a transferee who has received an asset by means of a fraudulent conveyance and should be required to either return the asset or pay for the asset (by way of a judgment and execution)." *Yusem v. S. Fla. Water Mgmt. Dist.*, 770 So. 2d 746, 749 (Fla. Dist. Ct. App. 2000); *see also Gen. Elec. Co. v. Chuly Int'l, LLC*, 118 So. 3d 325, 326 n.1 (Fla. Dist. Ct. App. 2013). FUFTA, § 726.105 provides:

> (1) a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
>> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
>>
>> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>>
>>> 1. Was engaged or about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>>
>>> 2. Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Fla. Stat. § 726.105(1). As noted previously, section 726.105(1)(a) concerns actual fraudulent transfer and section 726.2015(1)(b) concerns constructive fraudulent transfer.

An affirmative defense exists under FUFTA for transferees "who took [the assets transferred] in good faith and for a reasonably equivalent value." Fla. Stat. § 726.109(1); see *S.P. Richards Co. v. Hyde Park Paper Co.*, No. 8:11-cv-1204-EAK-TGW, 2015 WL 4548707, at *5 (M.D. Fla. July 28, 2015); *Regions Bank v. Kearney*, No. 8:13-cv-2627-T-26TBM, 2015 WL

1189959, at *1 (M.D. Fla. Mar. 16, 2015) (noting that good faith is an affirmative defense under FUFTA, which the defendant must prove). Determining good faith is a "fact-intensive inquiry." *S.P. Richards*, 2015 WL 4548707, at *5. The question when considering good faith is whether the transferee knew of the transferor's fraudulent purpose or whether the transferee "had knowledge of such facts of circumstances as would have induced an ordinarily prudent person to make inquiry, and which inquiry, if made with reasonable diligence, would have led to discovery of the [transferor's] fraudulent purpose." *Id.* (alteration in original) (quoting *Wiand v. Waxenberg*, 611 F. Supp. 2d 1299, 1319 (M.D. Fla. 2009)). "[A] transferee may not remain willfully ignorant of facts which would cause it to be on notice of a debtor's fraudulent purpose." *Waxenberg*, 611 F. Supp. 2d at 1319.

With respect to actual fraudulent transfer, "proof that a transfer was made in furtherance of a Ponzi scheme establishes actual intent to defraud under § 726.105(1)(a)." *Wiand v. Wells Fargo Bank, N.A.*, 86 F. Supp. 3d 1316, 1325 (M.D. Fla. 2015) (quoting *Wiand v. Lee*, 753 F.3d 1194, 1201 (11th Cir. 2014)). There is no dispute that Nikesh made the relevant transfers in furtherance of his Ponzi scheme.

With respect to constructive fraudulent transfer, there is no question that FFF engaged in a transaction for which the remaining assets of FFF were unreasonably small in relation to the transaction, § 726.105(1)(b)(1), and that Nikesh intended FFF to incur debts beyond what Nikesh knew FFF could pay as they became due, § 726.105(1)(b)(1). Constructive fraudulent transfer also requires FFF to have not received reasonably equivalent value, which is also an element of the good-faith transferee defense. "In the case of Ponzi schemes, the general rule is that a defrauded investor gives 'value' to the Debtor in exchange for a return of the principal amount of the investment, but not as to any payments in excess of principal." *Perkins v. Haines*, 661 F.3d

623, 627 (11th Cir. 2011) (citing *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008), and

*Scholes v. Lehmann*, 56 F.3d 750, 757–58 (7th Cir. 1995)); *see Wiand v. Morgan*, 919 F. Supp.

2d 1342, 1368 (M.D. Fla. 2013) ("[I]t is well-settled that a receiver is entitled to recover from

winning investors profits above the initial outlay, also known as 'false profits,' and an investor in

a scheme does not provide reasonably equivalent value for any amounts received from scheme

that exceed the investor's principal investment."). Thus, at least to the extent of the return of

principal to Defendants, Defendants gave reasonably equivalent value.[4]

    The Overall Receiver's FUFTA claims boil down to whether Defendants took the

relevant transfers in good faith.[5] The Overall Receiver argues that all he "need show is that the

ordinary dealer in USDA-guaranteed loans would have its suspicions aroused by the

circumstances surrounding the FFF sale and repurchase transactions so as to want to make

reasonable inquiries into the legitimacy of the transactions it was engaging in." (Dkt. 8, Pl.'s

Mem. Supp. Prelim. Inj., 11.) Defendants contend that they took the transfers in good faith and

followed industry standards. (*See* R. 1457, Defs.' Opp., 10–11.)

    As previously mentioned, the question before the Court is whether Defendants were on

inquiry notice—that is, whether Defendants had knowledge of circumstances that would have

induced an ordinarily prudent person to inquire into the legitimacy of the loans and FFF—and, if

they were on notice, whether a reasonably diligent inquiry would have led to the discovery of

---

[4] This depends on FFF having defrauded Defendants. *See Perkins*, 661 F.3d at 627.

[5] If Defendants can avail themselves of the good-faith defense, then the Overall Receiver can only recover Defendants' profits—approximately $756,000 according to the Overall Receiver, (Dkt. 8-1 at ¶ 34)—rather than the return of principal. *See Wiand v. Buhl*, No. 8:10-CV-75-T-17MAP, 2013 WL 12198453, at *1 (M.D. Fla. Jan. 11, 2013) (discussing an action to recover false profits and principal). The Overall Receiver, however, has framed his case as seeking a return of *all* funds transferred from FFF to Defendants in relation to the fraudulent loans—more than $20 million—not just Defendants' "false profits." (*See* Dkt. 8-1 at ¶ 33–34.) Because the Overall Receiver has not framed his arguments for a preliminary injunction based solely on the return of Defendants' profits, the Court will not consider whether an injunction is warranted based on a claim solely for those profits.

FFF's fraudulent purpose.[6]  *See S.P. Richards*, 2015 WL 4548707, at *5.  The second half of this analysis is clear—once placed on inquiry notice, Defendants could have easily confirmed the loans' authenticity with the USDA.  The first half of the analysis, however, is more difficult based on the record before the Court.

First, the Overall Receiver claims that "the initial transaction was by itself sufficient to put the reasonable dealer of securities of this type on 'inquiry notice.'"  (Dkt. 8 at 12.)  The Overall Receiver contends that it was suspicious that Nikesh asked BCM to hold the loan and refrain from marketing it as it would normally do.  (*Id.*)  Additionally, the Overall Receiver claims that the size of the loan was unusual and "the 90% guaranty rate was well beyond the limits of the USDA's own published guidelines of 70%."  (*Id.*)

On the evidence properly before it, the Court concludes these circumstances provide some support—though not conclusive support—for the proposition that Defendants were on inquiry notice.  While the USDA publishes information indicating that the maximum percent of guarantee for a loan between $5 million and $10 million is 70%, (*see* R. 1457-1, Ex. A, at 4; Dkt. 8-1 at ¶ 16), the USDA also says that "[a] limited amount of guarantee authority for 90 percent guarantees on loans of $10 million and less is available on an annual basis for high priority projects," (R. 1457, Ex. A, at 4).  Thus, the 90% guarantee rate was possible, albeit perhaps somewhat unusual.  Indeed, according to Banes, BCM "purchased many loans of which 90% was guaranteed by the USDA, including . . . a legitimate loan that was originated by FFF."  (*Id.* at ¶ 43(c).)  With respect to the size of the loan, the USDA indicates that while its loans generally "range from $200,000 to $5 million," loans "cannot generally exceed $10 million without an exception."  (R. 1457, Ex. A, at 4.)  A $10 million dollar loan is therefore possible

---

[6] In his briefs, the Overall Receiver does not appear to argue that Defendants had actual knowledge of the FFF fraud.

under the USDA's published guidelines, though it falls outside of the usual range of loans.[7]

Accordingly, the percentage guarantee and the size of the loan were outside the norm, which, while not impossible, is at least somewhat suspicious.

With respect to Nikesh's requests to hold loans, the Court finds them somewhat suspicious, but the suspiciousness is discounted because the Overall Receiver has not proffered evidence from a reliable industry expert. The Overall Receiver is not himself an experienced dealer in USDA-guaranteed loans, and while Nikesh has experience in the industry, the experience involves committing an enormous financial crime. Banes and Monaco, on the other hand, are experienced in the relevant industry, and they give plausible explanations of why the request to hold loans was not suspicious under the circumstances. (*See* R. 1457-1 at ¶¶ 30–35; R. 1457-2 at ¶ 17.) Additionally, Defendants never contractually agreed to hold the loans, so Nikesh's request to hold the loans was not necessarily a point of focus for Defendants, as they could sell the loans at any time. Accordingly, while Nikesh paints a somewhat suspicious picture based on his requests to hold loans, the Court does not give great weight to this evidence.[8]

---

[7] In his reply, the Overall Receiver refers to communications between the vice president of an Oklahoma Bank that originates U.S. government-guaranteed loans who expressed doubt that Nikesh could obtain 90% guaranteed loans from the USDA. (R. 1472, Pl.'s Reply, 13.) Additionally, in the e-mail chain, Kenneth Quigley, a USDA Rural Development Specialist in Oklahoma, indicates that Nikesh sought guaranteed loans from his office but was denied, although Quigley noted that "[Nikesh] may have gotten [90%-guaranteed loans] from some other states." (*Id.*; *see id.* Ex. A.) The Court will not consider these emails or the Overall Receiver's arguments related to them because they were raised for the first time in a reply brief. *See Wedemeyer v. CSX Transp., Inc.*, 850 F.3d 889, 898 (7th Cir. 2017); *see also Citizens Against Ruining the Env't v. E.P.A.*, 535 F.3d 670, 675 (7th Cir. 2008) ("It is improper for a party to raise new arguments in a reply because it does not give an adversary adequate opportunity to respond."). Moreover, these emails are not themselves dispositive. Defendants bought and sold a number of legitimate loans from FFF, and therefore had some reason to trust Nikesh. Additionally, Quigley indicates that while his office did not issue Nikesh's loans to him, another office could have.

[8] The Overall Receiver also argues that Nikesh's "changing stories regarding why he wanted BCM to hold the Fraudulent Loans" put Defendants on inquiry notice. (Dkt. 8 at 13.) Defendants say that while Nikesh had different business plans, it still made sense that he may have "wanted the capital from the sale of the loans now to originate more loans but that he thought the loans had an attractive interest rate, the borrowers were likely to keep paying, and he wanted to own them again in the future." (R. 1457 at 14.) While Nikesh's rapidly-changing business plans are suspicious, at least from the perspective of someone unfamiliar with the USDA-guaranteed loan industry, the

Second, the Overall Receiver points to Nikesh's failure to repurchase the loans when he said he would as a circumstance that would have put Defendants on inquiry notice. (Dkt. 8 at 13.) Nikesh's delay in buying back the loans may have suggested a cash-flow issue. The delay does not by itself establish that Defendants were on inquiry notice, but it supports the Overall Receiver's case.

Third, the Overall Receiver argues that the fact that Nikesh used a special purpose entity to repurchase the loans at Defendants' direction was suspicious. (Dkt. 8 at 13.) Here, the Overall Receiver relies on Nikesh's uncorroborated account for the contention that Defendants told him to create a special purpose entity. Defendants and Banes deny Nikesh's version of events. While a finder of fact might believe Nikesh and find a request to create a special purpose entity highly suspicious under the circumstances, the chance of such a finding is fairly low given Nikesh's credibility problems arising from his criminal background and his incentive for sentencing purposes to deflect blame and demonstrate cooperation with the Overall Receiver. Without some corroborating evidence, the Court places little value on Nikesh's assertion.

Finally, Defendants have presented evidence that, at the time in question, it was not industry practice to contact the USDA to confirm a loan's authenticity and require a Certificate of Incumbency. (*See supra*, Background, § II.) Defendants also have submitted evidence that they followed the Good Delivery Requirements as established by the Bond Market Association. (*Id.*) The Overall Receiver, on the other hand, has little support for his argument that Defendants had lax due diligence procedures in comparison to other firms in the industry beyond Nikesh's word. Without expert evidence regarding the USDA-loan industry, the Overall Receiver's allegations of lax due diligence are not especially persuasive. *See In re Taneja*, 743 F.3d 423,

Overall Receiver does not explain how, in the industry in question, Nikesh's claimed evolving business plans would have placed a firm in Defendants' position on inquiry notice. Thus, the Court will not weigh this factor heavily in the Overall Receiver's favor.

434 (4th Cir. 2014) (noting that considering industry standards "serves to establish the correct context in which to consider what the transferee knew or should have known"); *In re Hackney*, No. 09-79795-JRS, 2014 WL 4059787, at *5 (Bankr. N.D. Ga. Apr. 2, 2014).

Considering the evidence before the Court, the Overall Receiver's fraudulent transfer claim has a better than negligible chance of success, although his case is by no means ironclad given the Overall Receiver's lack of expert evidence and the substantial weight the Overall Receiver has placed on the assertions of Nikesh without any corroborating evidence.[9] Nevertheless, some of the circumstances regarding the loans are unusual enough in conjunction to raise suspicions. Additionally, it is possible a fact finder could believe Nikesh despite his credibility problems, which would make the Overall Receiver's case significantly stronger. The Overall Receiver has met his burden as to likelihood of success on the merits, but his chance of victory is far from certain.[10]

## II. Irreparable Harm and Existence of an Adequate Remedy at Law

To establish that the moving party is likely to suffer irreparable harm, he must show "more than a mere possibility of harm" that will result absent the requested preliminary relief. *Whitaker*, 858 F.3d at 1044-45. The movant need not show, however, that the harm is "certain to occur before a court may grant relief on the merits." *Id.* at 1045. "[H]arm is considered irreparable if it 'cannot be prevented or fully rectified by the final judgment after trial.'" *Id.*

---

[9] The Court does not consider potentially suspicious circumstances that the Overall Receiver does not assert in his argument concerning good faith. District courts should avoid sifting through the record to make arguments on behalf of parties. *See D.Z. v. Buell*, 796 F.3d 749, 856 (7th Cir. 2015); *Laboy v. Clements*, No. 15 CV 10771, 2017 WL 2936705, at *9 (N.D. Ill. July 10, 2017).

[10] With respect to the unjust enrichment claim, if the fraudulent transfer claim succeeds, the Court need not consider it. If the fraudulent transfer claim fails, the unjust enrichment claim for more than $20 million will fail as well because Defendants would have given value "for a return of the principal amount of the investment." *See Perkins*, 661 F.3d at 627; *Hawaiian Airlines, Inc. v. AAR Aircraft Servs., Inc.*, 167 F. Supp. 3d 1311, 1323 (S.D. Fla. 2016) (noting that unjust enrichment claims fail when the defendant gave adequate consideration for the benefit conferred upon him).

(quoting *Girl Scouts of Manitou Council, Inc., v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1089 (7th Cir. 2008). If money damages after a decision on the merits can fully repair a movant's injury, the movant "does not meet the standard for irreparable harm." *See D.U.*, 825 F.3d at 339. Additionally, "speculative injuries do not justify" the "extraordinary remedy" of a preliminary injunction. *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005); *see also Carlson Grp., Inc. v. Davenport*, No. 16-cv-10520, 2016 WL 7212522, at *7 (N.D. Ill. Dec. 13, 2016).

Relatedly, the movant must demonstrate that "he has no adequate remedy at law should the preliminary injunction not issue." *Whitaker*, 858 F.3d at 1046. "This does not require that he demonstrate that the remedy be wholly ineffectual." *Id.* "Rather, he must demonstrate that any award would be 'seriously deficient as compared to the harm suffered.'" *Id.* (quoting *Foodcomm Int'l v. Barry*, 328F.3d 300, 304 (7th Cir. 2003)).

The Overall Receiver has not made a "clear showing" of irreparable harm and inadequacy of a remedy at law. The Overall Receiver's argument related to irreparable harm in his opening brief is meager. (Dkt. 8 at 6–7.) He states, without citation to the record, that "BCM will deplete its equity and dissipate the proceeds of the Fraudulent Transfers." (*Id.* at 6.) As additional support, the Overall Receiver indicates that BCM had nearly $40 million of net equity in December 2015, but "that amount has since decreased." (*Id.* at 7.) The Overall Receiver attempts to make additional arguments in his reply brief, but, as noted above, the Court will not consider arguments presented for the first time in a reply brief. Banes, on the other hand, indicates that BCM is "financially healthy," has a total partner capital of $31 million dollars, and, although it suffered setbacks due in part to the loss of Pennant's financing, has largely recovered. (R. 1457-1 at ¶ 45.) In fact, Banes points out, "the fund is up 4.82 percent, (an annualized rate of

15.5%)" in 2017. (*Id.*) Given the evidence before it, not only does the Overall Receiver fail to sufficiently substantiate his fear that Defendants will dissipate their assets and become judgment proof, but it appears that Defendants' business is improving in 2017. In such circumstances, an injunction entangling the Court with a business's operations is unwarranted. *See, e.g.*, *Funai Elec. Co. v. Daewoo Elecs. Am., Inc.*, No. 10 CV 6461, 2010 WL 4340245, at *4 (N.D. Ill. Oct. 22, 2010) (concluding that the plaintiff's allegations of irreparable harm were speculative and that it failed to "present a sufficient basis for concluding that the defendant will be unable to satisfy a judgment or is fraudulently transferring funds"); *Travelers Cas. & Sur. Co. v. Wells Fargo Bank, NA*, No. 3:09 CV 501 PPS, 2009 WL 4881079, at *4 (N.D. Ind. Dec. 9, 2009) (concluding that that although in "limited circumstances a preliminary injunction is proper where money damages may be unobtainable because the defendant is dissipating assets and may become insolvent before entry of final judgment," a preliminary injunction was not warranted because the plaintiff failed to show that the Defendants were "dissipating funds or hiding assets"); *ZCM Asset Holding Co. (Bermuda) Ltd. v. Allamian*, No. 01 C 6250, 2002 WL 31870162, at *4 (N.D. Ill. Dec. 20, 2002). Additionally, because the Overall Receiver has only demonstrated a speculative risk that Defendants will dissipate their assets and become judgment proof, he has failed to show that there is no adequate remedy at law. Accordingly, the Court denies the Overall Receiver's requested injunctive relief. *See D.U.*, 825 F.3d at 335.

Even if the Overall Receiver had made the minimal necessary showing of irreparable harm, the balance of the hardships under the sliding-scale approach would tip in Defendants' favor. While the Overall Receiver made the threshold showing of a better-than-negligible likelihood of success on the merits, the Court has significant doubts about the strength of his case in light of the evidence properly before the Court. With respect to harm to Defendants, the

Overall Receiver seeks to prohibit BCM from, among other things, making any transfer in excess of $10,000 without permission from the Court. Defendants regularly make transfers in that amount to operate their business, as evidenced by the facts of this case, and the Court is ill-equipped to make business judgments regarding the USDA-guaranteed loan industry. An injunction therefore would significantly hamper Defendants in their business operations, and the public interest in a functioning secondary market for USDA-guaranteed loans would not be served by effectively making the Court a player in the industry. Moreover, the court oversight the Overall Receiver envisions would require substantial resources from Defendants as well as the judiciary, further harming Defendants' interests as well as those of the public. With respect to the harm to the Overall Receiver, there is only his speculation that Defendants will dissipate their assets and become judgment proof, leaving the receivership estate's creditors without recovery. Balancing these considerations in light of the Overall Receiver's probability of success on the merits, an injunction is inappropriate.

## CONCLUSION

For these reasons, the Court denies the Overall Receiver's motion for a preliminary injunction.

**Dated**: **August 14, 2017**

**AMY J. ST. EVE**
**United States District Court Judge**