**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | No. 14 CV 7581 |
| FIRST FARMERS FINANCIAL LITIGATION | ) | Hon. Amy J. St. Eve |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | |
| ORLANDO INTERNATIONAL HOTELS, LLC, | ) | |
| and | ) | |
| ROBERT J. GUIDRY INVESTMENTS, LLC, | ) | |
| | ) | |
| *Plaintiffs/Counter-Defendants*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL M. NANOSKY, not individually, | ) | |
| but solely as Receiver for the | ) | |
| Nanosky Receivership Estate | ) | |
| and | ) | |
| PATRICK D. CAVANAUGH, not individually, | ) | |
| but solely as Overall Receiver of the | ) | |
| Overall Receivership Estate, | ) | |
| | ) | |
| *Defendants/Counter-Plaintiffs*. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Orlando International Hotels, LLC ("Orlando International"), and Plaintiff

Robert J. Guidry Investments, LLC ("Guidry Investments"), (collectively, "Plaintiffs" or

"Buyers") brought this action against Defendant Michael M. Nanosky in his capacity as Receiver

of the Nanosky Receivership Estate ("Nanosky Receiver") and Defendant Patrick D. Cavanaugh

in his capacity as Overall Receiver of the Overall Receivership Estate ("Cavanaugh Receiver,"

and together with the Nanosky Receiver, "Defendants," "Receivers," or "Sellers") after the

parties failed to close on a real estate transaction governed by their Purchase and Sale Agreement

("PSA"). Before the Court are the parties' cross-motions for summary judgment on Count I of

the Plaintiffs' Amended Complaint and Counts I-III of Defendants' Answer and Counterclaims. (R. 1525; R. 1529.)  For the following reasons, the Court denies both parties' summary judgment motions.

## BACKGROUND

The underlying Receivership Action arises out of a massive fraud Nikesh Patel[1] perpetrated through the entity First Farmers Financial, LLC, which he utilized to fraudulently obtain millions of dollars from the sale of fictional loans that were purportedly guaranteed by the U.S. Small Business Administration or the U.S. Department of Agriculture's Rural Development Program.  The Court appointed Defendants Nanosky and Cavanaugh as Receivers in the Receivership Action and charged them with recovering investor assets, largely by selling properties of the receivership estates.  One of their duties[2] involved selling five hotels, including the hotel at issue in this case: the Doubletree by Hilton Hotel Orlando East, UCF Area, located at 12125 High Tech Avenue, Orlando, Florida 32817 ("Hotel" or "Property").

Plaintiffs are Orlando International and Guidry Investments.  Orlando International is a limited liability company organized under the laws of the State of Florida, with its principal place of business located in Orlando, Florida.  (R. 1568 at ¶ 1; R. 1566 at ¶ 7.)  Guidry Investments is a limited liability company organized under the laws of the State of Louisiana, with its principal place of business located in Harvey, Louisiana.  (R. 1568 at ¶ 2; R. 1566 at ¶ 7.)  Plaintiffs agreed to purchase the Hotel.  The real estate transaction between Plaintiffs and Receivers did not close on the stipulated date.

In their Amended Complaint, Plaintiffs seek a declaratory judgment stating that (1) Defendants breached the PSA by failing to satisfy the conditions precedent, denying that

---

[1] Patel pled guilty to criminal charges involving the fraud.  (C. No. 14 CR 546.)
[2] Nanosky Receiver has a more limited power than Cavanaugh Receiver.  (R. 29.)

Plaintiffs had properly terminated the PSA, and objecting to the Escrow Agent's release of the Deposit; and (2) Plaintiffs properly terminated the PSA and are entitled to the return of the $1,527,400.00 Deposit[3] currently held by the Escrow Agent. (R. 1304.) Plaintiffs also petition the Court to award them Purchaser's Costs as actual damages in addition to attorneys' fees and costs. (*Id.*)

In their Answer, Defendants bring three counterclaims against Plaintiffs, seeking declaratory judgment and alleging two types of breach of contract claims. (R. 825.) Count I for declaratory judgment requests that the Court declare that Plaintiffs did not validly terminate the PSA, and that Defendants are entitled to the Deposit and an award of attorneys' fees. (*Id.*) Counts II and III allege breach of contract, respectively, by "failure to close" and "good faith and fair dealing." (*Id.*) Receivers request that the Court find Plaintiffs in breach of the PSA, and award Receivers the Deposit as well as attorneys' fees and costs. (*Id.*)

## I. Northern District of Illinois Local Rule 56.1

Northern District of Illinois Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 924 (7th Cir. 1994)). Specifically, Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (quoting L.R. 56.1(a)(3)). The nonmoving party must file "a response to each numbered paragraph in the moving party's statement, including, in the case of any

---

[3] The full value of the Deposit, less $100.00 Independent Consideration.

disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." *Id*. (quoting L.R. 56.1(b)(3)(B)). The nonmoving party also may submit a separate statement of additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other materials relied upon to support those facts. *See* L.R. 56.1 (b)(3)(C); *see also Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643–44 (7th Cir. 2008).

The purpose of Rule 56.1 statements and responses is to identify the relevant admissible evidence supporting the material facts, not to make factual or legal arguments. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (finding Rule 56.1 statements noncompliant when they fail to "adequately cite the record" and are "filled with irrelevant information, legal arguments, and conjecture."). "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion." *Cracco*, 559 F.3d at 632. The Court may disregard statements and responses that do not properly cite to the record. *See Cichon v. Exelon Generation Co., LLC*, 401 F.3d 803, 809–810) (7th Cir. 2005). Moreover, the requirements for responses under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000); s*ee also Thele v. Sunrise Chevrolet, Inc*., 2004 WL 1194751, *3 (N.D. Ill. May 28, 2004) ("The mere denial of a particular fact without specific references to affidavits, parts of the record, and other supporting materials is insufficient, and, where a properly supported factual assertion is met with such a naked denial, the fact may be deemed admitted."). "[D]istrict courts are entitled to expect strict compliance with Local Rule 56.1." *Raymond v. Ameritech Corp*., 442 F.3d 600, 604 (7th Cir. 2006); *see also Reed v. Allied Waste Transp., Inc*.,

621 F. App'x 345, 347 (7th Cir. 2015), *reh'g denied* (July 30, 2015) ("[W]e will enforce the district court's choice to demand strict compliance with Local Rule 56.1.")

Prior to reciting the facts of this case, the Court notes practices by Plaintiffs that are problematic under Local Rule 56.1. Plaintiffs include legal conclusions in their statements of facts. (*See, e.g.*, R. 1568 at ¶ 70, 71.) It is inappropriate for parties to attempt to disguise arguments as facts. Additionally, in response to certain statements of fact, Plaintiffs admit and then supplement the fact with further details or a legal conclusion. (*See, e.g.*, R. 1566 at ¶ 92, 98.) This, too, violates Local Rule 56.1. Further, Plaintiffs fail to cite to specific portions of the record, sometimes referencing dozens of pages of depositions. (*See, e.g.*, R. 1568 at ¶ 40, 46.) Plaintiffs also attempt to create factual disputes by challenging the inferences that can be drawn from the evidence. (*See, e.g.*, R. 1566 at ¶ 41, 57, 70.) In its review of the facts, the Court disregarded the portions of facts where Plaintiffs violated Local Rule 56.1. With this in mind, the Court now turns to the relevant facts.

## II. Relevant Facts

### A. Purchase and Sale Agreement

The Receivers put the Hotel up for sale on the real estate website Auction.com in July 2015. (R. 1568 at ¶ 11; R. 1566 at ¶ 11.) Guidry Investments submitted a winning bid to purchase the Hotel for $30,050,000.00 plus a 500,000.00 buyer's premium. (R. 1568 at ¶ 13-14; R. 1566 at ¶ 15.) The parties executed the PSA, dated July 22, 2015. (R. 1568 at ¶ 15; R. 1566 at ¶ 15.) The parties do not dispute the validity of the contract, only the interpretation of various obligations under its terms.

The Effective Date of the PSA was July 22, 2015, which makes the Closing Date September 8, 2015, per the PSA's provisions. (R. 1566 at 19; R. 1568 at 16-17.) PSA § 2.7

provides for Plaintiffs' "onetime option to extend the Closing Date by an additional period of fifteen (15) days by providing notice thereof to Seller…and delivering to Escrow Agent an amount equal to five percent (5%) of the Purchase Price not less than three (3) Business Days prior to the scheduled Closing Date." Defendants also had an option to extend the Closing Date. PSA § 6.6 "Postponement of Closing Date" provides in part that "If Seller and Owner have elected to cure any Monetary Title Objections arising from a New Lien or Non-Monetary Title Objections and are unable to do so prior to the scheduled Closing Date, upon notice from Seller to Purchaser, the Closing shall be adjourned for a period not to exceed thirty (30) days to allow Seller and Owner an additional period to cure such Monetary Title Objections arising from a New Lien or Non-Monetary Title Objections." Further, PSA § 23.11 provides that "[t]ime is of the essence in the performance of all obligations by Purchaser, Seller and Owner under this Agreement."

PSA § 2.6 defines Closing as "[t]he delivery of the Deed to Purchaser by the Seller concurrent with the delivery of the Cash to Close to the Seller." Further, PSA § 11 reads "Closing. Subject to all of the provisions of this Agreement, Purchaser, Seller and Owner shall close this transaction on the Closing Date commencing at 10:00 a.m. Eastern Time." According to PSA § 14, "Closing Procedure:"

The Closing shall proceed in the following manner:

14.1 Transfer of Funds. Purchaser shall pay the Cash to Close to the Escrow Agent by wire transfer of federal funds to a depository designated by Escrow Agent.

14.2 Delivery of Documents. Seller and Owner shall deliver Seller's/Owner's Closing Documents and Purchaser shall deliver Purchaser's Closing Documents to the Escrow Agent.

14.3 Disbursement of Funds and Documents. When the Title Company has deleted all the requirements, "insured the gap," i.e., endorsed the Title Commitment to delete the exception for matters appearing between the effective date of the Title

Commitment and the effective date of the Title Policy and marked up the Title Commitment agreeing to insure Purchaser's ownership of the Land and Improvements subject only to the Permitted Exceptions, and the Escrow Agent has received the Cash to Close by wire transfer of federal funds from Purchaser, Escrow Agent shall disburse the Cash to Close and Deposit to Seller (except the Buyer's Premium, which shall be disbursed to Auctioneer), then the Escrow Agent shall disburse all amounts required to fund closing costs and expenses as set forth in the Closing Statement; deliver Seller's/Owner's Closing Documents to Purchaser; deliver Purchaser's Closing Documents to Seller; provided, however, that Escrow Agent shall record the Deed in the Public Records of the county where the Land is located.

The PSA requires that these steps occur in close succession and all be completed on or before the Closing Date.

The PSA required Purchasers to pay money in exchange for the Sellers providing title to the Property. PSA § 6.1 provides in part that "[a]t Closing, Seller and Owner shall convey fee simple title to the Land and Improvements, subject only to the Permitted Exceptions (defined below). Seller and Owner shall satisfy and have dismissed or insured over all matters with respect to title arising from the Existing Litigation (including all liens of any nature whatsoever)." PSA § 6.3 defines Permitted Exceptions as:

(a) Title Company's standard exceptions; (b) liens for all current general and special real property taxes and assessments not yet due and payable; (c) liens of supplemental taxes, if any assessed; (d) any facts an accurate survey and/or a personal inspection of the Property may disclose; (e) the mortgage/deed of trust/deed to secure debt lien in connection with any Purchaser financing; (f) any laws, regulations, ordinances (including but not limited to, zoning, building and environmental) as to the use, occupancy, subdivision or improvement of the Property adopted or imposed by any governmental body, or the effect of any non-compliance with or any violation thereof, including but not limited to, any disclosure and/or report required by ordinance; (g) rights of existing tenants and/or occupants of the Property (if any); (h) covenants, restrictions, easements and other matters of record as of the effective date of the Title Commitment that affect the Property; (i) non-monetary encumbrances disclosed to Purchaser in writing prior to entering into this Agreement that Seller and Owner are not expressly obligated to cure hereunder; (j) any other matter for which Title Company agrees to provide insurance at no additional cost to Purchaser; and (k) any other matter that Purchaser has approved or is deemed to have approved hereunder.

PSA § 2.14 defines "Existing Litigation" as "Those matters and claims of lien [sic] more particularly described on Schedule 2.14 attached hereto, but shall not include the [Receivership] Action." PSA Schedule 2.14 lists only one "Existing Litigation" as "*True Line Contracting & Remodeling Services, Inc., d/b/a Vision Hospitality Construction v. Alena Hospitality UCF, LLC, Rosen Materials, LLC and Harris Civil Engineers, LLC*, Case No. 2015-CA-000300-O, pending in the Circuit Court of the Ninth Judicial Circuit, in and for Orange County, Florida." (R. 1566 at ¶ 61.)

The PSA provides ways for the Purchaser and Seller to resolve any new title commitment matters, or title objections, that come up between "the delivery of the initial Title Commitment and prior to Closing" in PSA § 6.4. The Seller has the option to cure the objection monetarily per PSA § 6.5.1 (Monetary Title Objections), or to cure non-monetarily or to not cure at all (either unable to cure or elected not to cure) per PSA § 6.5.2 (Non-Monetary Title Objections). If the Seller does not cure, the Purchaser my waive the objection or terminate the PSA if the objection "has a material impact on the marketability or value of the Hotel or the operation of the Hotel as a hotel." (PSA § 6.5.2.) PSA § 6.7 provides for termination of the PSA: "Upon the termination of this Agreement pursuant to this Section 6, Escrow Agent shall return the Deposit to Purchaser (less the $100.00 Independent Consideration to be paid to Seller); and thereafter neither Purchaser, Seller nor Owner shall have any further rights or obligations hereunder except as otherwise provided for in this Agreement."

In addition to the Permitted Exceptions and the Existing Litigation, the PSA provides for one further stipulation as to the title to the Property. PSA § 10.3, entitled "Mutual Condition; Approval by the Court," states in all capital letters:

NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, THE PARTIES ACKNOWLEDGE AND AGREE THAT THIS AGREEMENT AND THE CLOSING OF THE TRANSACTION EVIDENCED HEREBY ARE SUBJECT TO THE REVIEW OF AND APPROVAL BY THE COURT. IN THE EVENT THE COURT DISAPPROVES OF THIS AGREEMENT OR THE CLOSING OF THE TRANSACTION EVIDENCED HEREBY FOR ANY REASON OR NO REASON, THIS AGREEMENT SHALL IMMEDIATELY TERMINATE UPON SELLER'S DELIVERY TO PURCHASER OF NOTICE OF SUCH DISAPPROVAL, ESCROW AGENT SHALL PROMPTLY RETURN THE DEPOSIT TO PURCHASER AND THE PARTIES SHALL HAVE NO FURTHER RIGHTS OR OBLIGATIONS HEREUNDER EXCEPT PURCHASER'S OBLIGATIONS IN ARTICLE 5 HEREOF THAT EXPRESSLY SURVIVE TERMINATION. IF THE COURT HAS NOT EITHER APPROVED OR DISAPPROVED OF THIS AGREEMENT AND THE TRANSACTION EVIDENCED HEREBY ON OR PRIOR TO THE CLOSING DATE, THE CLOSING DATE SHALL BE AUTOMATICALLY EXTENDED TO THE DATE THAT IS THREE (3) BUSINESS DAYS AFTER THE DATE ON WHICH SELLER PROVIDES NOTICE TO PURCHASER THAT THE COURT HAS PROVIDED SUCH APPROVAL; PROVIDED, HOWEVER, THAT IF THE COURT HAS NOT PROVIDED EITHER SUCH APPROVAL OR DISAPPROVAL ON OR PRIOR TO THE DATE THAT IS THIRTY (30) DAYS AFTER THE DATE ON WHICH SUCH EXTENSION COMMENCED, SELLER OR PURCHASER MAY TERMINATE THIS AGREEMENT BY NOTICE TO THE OTHER, ESCROW AGENT SHALL PROMPTLY RETURN THE DEPOSIT TO PURCHASER AND THE PARTIES SHALL HAVE NO FURTHER RIGHTS OR OBLIGATIONS HEREUNDER EXCEPT PURCHASER'S OBLIGATIONS IN ARTICLE 5 HEREOF THAT EXPRESSLY SURVIVE TERMINATION. IF THE CLOSING DATE IS EXTENDED PURSUANT TO THIS SECTION 10.3 AND THE COURT ULTIMATELY DISAPPROVES, THIS AGREEMENT SHALL TERMINATE IN THE MANNER PROVIDED IN THIS PARAGRAPH.

The PSA does not address what the parties refer to as the "appeal period gap" (which caused the "appeal period title exception")—the 30-day appeal window after the Court's final order approving the sale.

The parties had identical requirements to obligate the other party to close per PSA § 10—with the exception of one extra requirement for Defendants to obligate the Plaintiffs. Both parties had to perform "in all material respects all covenants, agreements and obligations[,] and compl[y] with all conditions required by this Agreement to be performed or complied with by

[the other party] prior to the Closing Date" (PSA §§ 10.1.1 and 10.2.1), and deliver "to Escrow Agent all instruments and documents to be delivered to [the other party] at the Closing pursuant to this Agreement" (PSA §§ 10.1.2 and 10.2.2). The "representations and warranties" of both parties had to "be true and correct in all material respects as of the Closing Date." (PSA §§ 10.1.3 and 10.2.3.) These were the mutual conditions to the other party's obligation to close: one party was not "obligated to close unless and until each of the following conditions [was] either fulfilled or waived, in writing." (PSA § 10.1.) Defendants' extra condition to obligate Plaintiffs to close was PSA § 10.1.4 Status of Title, which provided that "The status of title to the Land and Improvements shall be subject only to the Permitted Exceptions."

PSA § 18 provides for the defaults of the parties under the PSA. "In the event that this transaction fails to close due to a default on the part of Purchaser, the Deposit shall be paid to Seller (as Receiver) as agreed-upon liquidated damages and thereafter, except as otherwise specifically set forth in this Agreement, neither Purchaser, Seller nor Owner shall have any further obligation under this Agreement." (PSA § 18.1.)

> If this transaction shall not be closed because of default on the part of the Seller or Owner, then Purchaser shall have the right to elect, upon written notice to Pennant, Seller and Owner, to either (i) terminate this Agreement and receive back the Deposit (less the $100.00 Independent Consideration) and Seller and Owner shall pay to Purchaser Purchaser's Costs, in which event this Agreement shall be null and void and neither Pennant, Seller, Owner nor Purchaser shall have any further rights or obligations hereunder except that the parties shall remain obligated pursuant to the provisions hereof which survive termination; (ii) waive such default and close the transaction pursuant to this Agreement; or (iii) pursue specific performance against Seller and Owner, as applicable, enforcing Seller's and Owner's obligation to sell and convey the Property to Purchaser at Closing in accordance with the provisions herein contained.

(PSA § 18.2.) Under PSA § 18.3, "the non-defaulting party shall provide written notice specifying such default to the other party" and the defaulting party "shall have ten (10) days following such notice to cure such default." The notice "provision shall not apply to failure by

10

the Defaulting Party to close on the Closing Date, as to which date time is of the essence." (PSA § 18.3.) The PSA does not provide a remedy for when both parties breach the contract or when neither party breaches the contract, yet the parties do not perform and the transaction fails to close.

According to the terms of the PSA, the Seller must keep the $100.00 "Independent Consideration" no matter who is awarded the Deposit in case of a default or breach. (PSA §§ 4.2 and 18.2.) The PSA also provides for attorneys' fees if either party obtains a judgment against the other for breach of the Agreement, per PSA § 23.7. Further, if a court finds in the Seller's favor, the Seller keeps the Deposit per PSA §§ 4.1 and 18.1. If a court finds in the Purchaser's favor, the Escrow Agent returns the Deposit, less the $100.00 Independent Consideration. (PSA §§ 4.2 and 18.2.)

With the PSA executed, Guidry Investments deposited the sum of five percent of the "Purchase Price" for the Hotel in the amount of $1,527,500.00 (the "Deposit") with the escrow agent Fidelity National Title Insurance Company (the "Escrow Agent" or "Fidelity"), per PSA Section 4.1. (R. 1566 at ¶ 16: R. 1568 at ¶ 19.) According to Plaintiffs, they transmitted the Deposit "in three separate wire transfers: two on July 23, 2015, in the amounts of $1,352,000.00 and $500.00, respectively, sent by Guidry Investments; and another on July 24, 2015, in the amount of $175,000.00, sent by Ultra Escrow, Incorporated." (R. 1304 at ¶ 15.) Guidry Investments assigned, transferred, and conveyed their rights and interests under the PSA to Orlando International on July 29, 2015, and notified the Receivers of the assignment on August 17, 2015. (R. 1566 at ¶ 17; R. 1568 at ¶ 20.)

### B. Failure to Close on September 8, 2015 Closing Date

The parties dispute the details of their respective preparations for closing and the status of the Hotel's title with regard to the appeal period gap. These facts, however, are not material facts that would prevent the Court from ruling on the summary judgment motions. [4]

On September 3, 2015, the Receivers brought a motion before the Court to resolve the disagreement over the transaction's closing date. (R. 437.) Counsel for the Receivers subsequently informed the Court that the dispute was not "problematic" and the Court did not need to resolve the issue. (R. 534 at 8.) In addition, the Court reiterated in its September 8, 2015 order that "[u]nless extended pursuant to the terms of the Purchase Agreement, the term Closing Date as defined in the Purchase Agreement is 45 days after the July 22, 2015 Effective Date." (R. 463 at ¶ 4; R. 1568 at ¶ 24-25.)

The parties do not dispute that they failed to close on the September 8, 2015 Closing Date. (R. 1568 at ¶ 76.) Plaintiffs did not tender the Cash to Close for the Hotel to the Receivers on September 8, 2015, or at any time thereafter. (R. 1566 at ¶ 88.) Fidelity would not issue to Sellers a title that insured over the appeal period. (R. 1566 at ¶ 80.) Receivers' counsel admitted that the Receivers could not procure by the Closing Date a title insurance policy from Fidelity that would insure over the appeal period. (R. 1568 at ¶ 72; *see also id.* at ¶ 67-69.) Fidelity eventually issued an updated commitment for title insurance with an effective date of September 11, 2015 that changed the amount of sale proceeds that would be held in escrow and did not take an exception to title for the appeal period. (R. 1566 at ¶ 104.) [5]

---

[4] The Court cannot make findings of fact on summary judgment motions. Additionally, neither party raises anticipatory breach or repudiation, so the Court does not address these arguments in relation to the facts at issue.

[5] Plaintiffs respond that they do not dispute this factual assertion by Defendants, but then restate the sentence in different terms, writing that the updated title commitment "did not take exception to title for the mechanics' liens and Existing Litigation," rather than the appeal period. The Court will read ¶ 104 as admitted.

On September 9, 2015, Plaintiffs sent Defendants a termination letter, notifying them that they wished to exercise their right under PSA § 18.2 to terminate the agreement and receive a refund of the Deposit because Defendants did not provide title as required by PSA §§ 6.1 and 6.4, among others.  (R. 1568 at ¶ 77-78; R. 1566 at ¶ 92-93.)  On September 21, 2015, Defendants responded to the termination letter, stating that they objected to the return of the Deposit and that the new closing date was October 2, 2015.  (R. 1568 at ¶ 79; R. 1566 at ¶ 105.)  In February 2016, the Court approved the sale of the Hotel to another purchaser for $25,000,000.  (R. 1566 at ¶ 108.)

## LEGAL STANDARD

"Summary judgment is proper when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 220 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(a)); *see also Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009) (Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.)  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000) ("The existence of a mere scintilla of evidence supporting a plaintiff's position is insufficient; there must be evidence on which a jury could reasonably find for the plaintiff.").  In ruling on a motion for summary judgment, the court must consider the record as a whole, in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the non-

moving party.  *Gee v. Dart*, 2017 WL 4699237, *3 (N.D. Ill. Oct. 19, 2017) (citing *Anderson*, 477 U.S. at 255).

The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that he is entitled to judgment as a matter of law.  *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010).  If the moving party demonstrates the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute."  *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-movant must go beyond the pleadings and "set forth specific facts showing there is a genuine issue for trial."  *Hannemann v. Southern Door County School Dist.*, 673 F.3d 746, 751 (7th Cir. 2012).  "To survive summary judgment, the non-moving party must show evidence sufficient to establish every element that is essential to its claim and for which it will bear the burden of proof at trial."  *Life Plans, Inc. v. Security Life of Denver Ins. Co*., 800 F.3d 343, 349 (7th Cir. 2015).  "On review of cross-motions for summary judgment, we view all facts and inferences in the light most favorable to the nonmoving party on each motion."  *Lalowski v. City of Des Plaines*, 789 F.3d 784, 787 (7th Cir. 2015) (citing *Wis. Alumni Research Found. v. Xenon Pharm., Inc.*, 591 F.3d 876, 882 (7th Cir. 2010)).

## ANALYSIS

The parties have filed cross-motions for summary judgment arguing that the opposing party defaulted on the PSA.  Plaintiffs argue that the PSA created sequential obligations—Defendants' obligation to provide clear title was a condition precedent that triggered Plaintiffs' obligation to close and to tender the Purchase Price for the Property.  (R. 1526 at 10-12.) Plaintiffs claim that because the title had outstanding issues and Defendants failed to provide clear title on the Closing Date per PSA §§ 6 and 10, Defendants defaulted.  (*Id*.)  Plaintiffs also

argue that they worked in good faith to close on the Closing Date, and are thus entitled to terminate the contract and receive a refund of their Deposit under PSA § 18.2.  (*Id*. at 7-10.) Lastly, since Plaintiffs did not breach any express term of the contract, they argue that they legally could not have breached an implied covenant of good faith and fair dealing.  (*Id*. at 12-14.)

Defendants likewise argue that the PSA created sequential obligations, but they contend that Plaintiffs' tender of the remaining funds was the triggering event, not Defendants' delivery of clear title.  (R. 1531 at 12-15.)  Defendants reason that since Plaintiffs failed to tender the Purchase Price, Defendants' obligation to close and convey title never arose.  (*Id*.)  Defendants further argue that the PSA does not require them to demonstrate that they could convey clear title prior to the Closing Date.  (*Id*. at 15.)  According to Defendants, there was no "appeal period title exception" in the PSA[6] and Plaintiffs proposed this title issue to Fidelity.  (*Id*. at 18-21.)  Further, Defendants claim they could have monetarily cured the Existing Litigation, which Plaintiffs contend would have prevented Defendants from acquiring a clear title at the closing.  (*Id*. at 21-22.)  Defendants maintain that Plaintiffs did not and could not have terminated the PSA because Plaintiffs were themselves unable to perform on the Closing Date and were not ready to take over the Hotel.  (*Id*. at 22-24.)  As such, Defendants claim that Plaintiffs breached the PSA by failing to close, and also by breaching their duty of good faith and fair dealing to both the Court and Defendants.  (*Id*. at 24-30.)

---

[6] See discussion of PSA § 10.3 in the background section above.

# I.    The Terms of the PSA Required Concurrent Performance

The terms of the PSA are at the heart of the parties' disagreement.  PSA § 23.8 provides that the parties' contract "shall be interpreted in accordance with the internal laws of the State of Florida both substantive and remedial."  Neither party disputes that Florida law applies.

Under Florida law, "[t]he cardinal rule of contractual construction is that when the language of the contract is clear and unambiguous, the contract must be interpreted and enforced in accordance with its plain meaning."  *Columbia Bank v. Columbia Developers*, *LLC*, 127 So.3d 670, 673 (Fla. Dist. Ct. App. 2013); *accord Green v. Life & Health of Am.*, 704 So.2d 1386, 1391 (Fla. 1998) ("We have long held that under contract law principles, contract language that is unambiguous on its face must be given its plain meaning."); *see also Dirico v. Redland Estates, Inc.*, 154 So. 3d 355, 359 (Fla. Dist. Ct. App. 2014) (Where "a contract's terms are clear and unambiguous, the language itself is the best evidence of the parties' intent and its plain meaning controls, warranting summary judgment."); *Real Estate Value Co. v. Carnival Corp.*, 92 So. 3d 255, 262 (Fla. Dist. Ct. App. 2012) (holding that the meaning of an unambiguous contract is an issue for the court to determine as a matter of law).  Generally and "[w]henever possible, a contract must be construed according to its plain language."  *Hand v. Grow Constr., Inc*., 983 So. 2d 684, 686–87 (Fla. Dist. Ct. App. 2008) (citing *Khosrow Maleki, P.A. v. M.A. Hajianpour, M.D., P.A.*, 771 So.2d 628, 631 (Fla. Dist. Ct. App. 2000)).

Florida courts find contractual language ambiguous "only if it is susceptible to more than one *reasonable* interpretation."  *BKD Twenty-One Mgmt. Co. v. Delsordo*, 127 So.3d 527, 530 (Fla. Dist. Ct. App. 2012) (original emphasis).  Thus, "where one interpretation of a contract would be absurd and another would be consistent with reason and probability, the contract should be interpreted in the rational manner."  *Id.*

"Additionally, to give the proper meaning to a specific contract provision, a court must consider it in [the] context of the entire contract." *Id.*; *see also James v. Gulf Life Ins. Co*., 66 So.2d 62, 62 (Fla. 1953) ("[A]n isolated sentence of [a contract] should not be construed alone, but it should be construed in connection with other provisions . . . to arrive at a reasonable construction to accomplish the intent and purpose of the parties."); *Lewis v. Evanston Ins. Co.*, 2016 WL 7042961, *1 (M.D. Fla. June 17, 2016), *aff'd*, 690 F. App'x 638 (11th Cir. 2017) ("Individual terms must not be considered in isolation when interpreting a contract, but rather must be interpreted as a whole and in relation to one another."). Further, covenants in a contract are "always considered dependent unless the contrary intention appears" in the text of the document. *Reider v. P-48, Inc*., 362 So.2d 105, 109 n. 4 (Fla. Dist. Ct. App. 1978) (citing *Walker v. Close*, 98 Fla. 1103, 125 So. 521, 528 (Fla. 1929)).

Several courts, both in Florida and elsewhere, applying similar contract interpretation principles, have held that contracts for real property that include concurrent performance language, provide that "time is of the essence," and contain clauses to formally delay the closing date require concurrent performance on the closing date. In *MasTec, Inc. v. TJS, LLC*, 979 So. 2d 285 (Fla. Dist. Ct. App. 2008), for example, a Florida appellate court analyzed a contract for real property that provided that "time was of the essence" for all of its provisions and stated that the contract would "be closed and the deed and possession delivered on or before July 25, 2003, unless extended by other provisions of this Contract." *Id.* at 286. The seller was responsible for preparing the title insurance commitment, and due to title insurance issues, the parties agreed in writing to move the closing date several times. *Id.* at 287-89. Partially due to these issues, the final "drop-dead date" for closing "expired without either party taking steps to close the Contract." *Id.* at 289. The buyer sought damages and specific performance. *Id.* at 289.

The trial court found that the parties had not effectively agreed to extend the closing date past the "drop-dead date," but still ruled that the buyer was entitled to specific performance because an addendum had relieved the buyer of its contractual duty to provide written notice of title defects upon receipt of the title commitment and because the seller's failure to send notice of its inability to cure title defects obligated it to convey marketable title on the drop-dead date. *Id.* at 290. The Florida appellate court overruled the trial court's decision. The Court found that the contract required concurrent performance by the parties—tendering payment and conveying title—on the closing date. *Id.* at 292. As such, the seller could not have breached the contract and the buyer was "not entitled to specific performance" because the buyer "did not tender the purchase price to the [s]eller before the Contract expired" on the drop-dead date. *Id.* at 291-92. The court emphasized the "time is of the essence" language in the contract and explained that "in the absence of the Buyers' tender of the purchase price on or before [the closing date], the Seller never became obligated to convey title before the Contract expired." *Id.* at 292 (citations omitted); *see also Booth v. Bobbitt*, 94 Fla. 704, 707-78 (Fla. 1927) ("Where the payment of the last installment of purchase money by the vendee and the conveyance of the title by the vendor are concurrent and dependent acts, the vendor, before he can maintain a bill for specific performance against the vendee, must tender to the vendee . . . such a conveyance of the title as is required by the contract.").

Another Florida appellate court has similarly recognized the requirements of concurrent performance in property transactions. Specifically, in *Sun First Nat. Bank of Orlando v. Grinnell*, 416 So. 2d 829, 829 (Fla. Dist. Ct. App. 1982), a case involving a mortgage and property dispute, the court found that the contract required concurrent performance whereby "at closing both parties simultaneously and fully discharge their promises and contract duties by

performance when the seller delivers a proper deed and the buyer delivers purchase money due at closing and the promised note and mortgage." *Id*. at 832. The court further explained that "the original contract for the sale and purchase of land is the usual bilateral executory contract [in which]…[t]he seller promises to convey title to land by delivery of a deed to the buyer in exchange for the buyer's promise to pay the seller the purchase price." *Id.* The court emphasized that both the buyer and seller's promises were "mutually dependent and conditional, requiring concurrent performances." *Id.*

Courts in other jurisdictions have similarly found that property contracts with concurrent obligation language, "time is of the essence" provisions, and clauses that provide for formal extensions of the closing date require concurrent performance on the closing date and further do not allow for a finding of default or breach where neither party met its obligation. In *Addie v. Kjaer*, 737 F.3d 854 (3d Cir. 2013), for example, the Third Circuit resolved a dispute over the sale of an island property when the transaction failed to close. The contract required that the buyer "pay the purchase price at closing, less the deposit," and that the seller deliver at closing clear and marketable title as well as certain land-use permits. *Id.* at 858. The buyer placed a $1.5 million deposit into escrow, as the contract required, and after the parties identified some title and land-use issues, they extended the closing date to September 14. *Id.* at 859. In their extension agreement, the parties agreed that "time [was] of the essence." *Id.*

As of the September 14 closing date, the buyers had not paid the purchase price and the sellers had not conveyed clear and marketable title or updated the land-use permits. *Id.* The transaction failed to close, and both the buyers and sellers sued each other for breach of contract. *Id.* The case went to trial and the jury found that certain of the buyers and all of the sellers had breached the contract, and awarded $1.5 million in damages—the deposit amount—to the non-

breaching buyer.  *Id.* at 860.  The trial court vacated the jury's damage award and found that no party was entitled to damages or recovery on their breach of contract claims because the contract imposed concurrent conditions that all parties had failed to perform on within the closing timeframe.  *Id.*

On appeal, the sellers argued that they were entitled to keep the $1.5 million deposit because the contract at issue included liquidated damages clauses that provided for the non-defaulting party to retain the deposit if the other party defaulted, and because they had offered performance in the closing timeframe and provided the necessary title documents.  *Id.* at 861-62. Applying the Restatement of Contracts, the Third Circuit found that the contract required concurrent performance and explained that in such a contract, "a party is not required to perform until the other party makes a valid offer to perform" and if "no party performs, neither party is in default, nor liable for breach."  *Id.* at 862 (quoting Restatement (Second) of Contracts § 238 cmt. a. (1981)).  The court found that the sellers' purported delivery of the escrow documents "did not amount to a valid offer of performance" because under the Restatement, a valid offer to perform "must be made with the manifested present ability to make it good," and sellers did not and could not deliver clear and marketable title on the closing date.  *Id.* at 862-63.  The court noted that the sellers' offers to perform after the closing were invalid because after the closing date, "neither party was required to perform" since the parties had already been discharged.  *Id.* at 863.  As such, the court held that because "the conditions were not satisfied by the last day to close under the contracts, the duties of the parties were discharged, leaving neither party liable for breach." *Id.* at 864.

Similarly, in *Pittman v. Canham*, 3 Cal. Rptr. 2d 340 (Cal. Ct. App. 1992), a California appellate court found that the failure of both parties to perform concurrent conditions during the

time for performance discharged both parties from the contract. In that case, the purchaser in a failed real estate transaction sued the seller for breach of contract. *Id.* at 341. The contract at issue provided that "[t]ime is of the essence" and that "[a]ll modifications or extensions shall be in writing signed by the parties." *Id.* Despite these conditions, as of the closing date, the seller had "not tendered a notarized deed" and the buyer had not tendered the purchase price. *Id.* The court found that the contract required concurrent performance, which both parties had failed. *Id.* The court explained that while the buyer may have been reluctant to put the deposit into escrow, "in a contract with concurrent conditions, the buyer and seller cannot keep saying to one another, 'No, you first.'" *Id.* at 342.

In addition, the court explained that "[c]oncurrent conditions are conditions precedent which are mutually dependent" and as such, both parties must perform at the same time. *Id.* As a result, the court held that the "failure of both parties to perform concurrent conditions during the time for performance results in a discharge of both parties' duty to perform. Thus, where the parties have made time the essence of the contract, at the expiration of time without tender by either party, both parties are discharged." *Id.* As such, the court held that neither party had a cause of action for default or breach of contract. *Id.*; *see also Rutherford Holdings, LLC v. Plaza Del Rey*, 166 Cal. Rptr. 3d 864, 869-70 (Cal. Ct. App. 2014) (finding in property sale that "delivery of the deed and the payment of the purchase price are dependent and concurrent conditions" and where "both parties failed to perform the concurrent conditions before closing," the result is a discharge of both parties' duty to perform).

Likewise, in *Willener v. Sweeting*, 107 Wash. 2d 388 (Wash. 1986), the Supreme Court of Washington held that prospective purchasers of a tract of land were entitled to a return of their earnest money deposit where the terms of the contract required concurrent performance and

neither party to the contract performed. Specifically, the court rejected the argument that one party's performance was a condition precedent to the other's performance, and instead found that the parties' duties were concurrent conditions. *Id.* at 394-95. The court explained that "[a] vendor selling land may not put the buyer in default until the vendor has offered to perform; the payment of the purchase price and the delivering of the deed are concurrent acts." *Id.* (citations omitted). The court concluded where parties have concurrent duties to perform and they do not perform, they have no right to bring an action for contract damages—whether they are the purchasers or the sellers. *Id.* at 396.

Here, as in the cases described above, the plain language of the PSA required concurrent performance by both parties on the September 8, 2015 Closing Date. Specifically, the PSA provided that September 8, 2015 was the Closing Date for this transaction and defined Closing as "the delivery of the Deed to Purchaser by the Seller *concurrent* with the delivery of the Cash to Close to the Seller"—an exchange of money for a hotel property. (PSA §§ 2.6 and 2.7 (emphasis added).) As the court found in *Mastec*, *Booth*, and *Addie*, here, the plain language of the contract required both parties to perform their obligations—producing clear and marketable title for the sellers and tendering the purchase price for the buyers—at the date of closing. *See MasTec*, 979 So. 2d 285 (finding concurrent performance); *Booth*, 94 Fla. 704 (finding mutual and dependent performance); *Addie*, 737 F.3d 854 (finding concurrent conditions requiring simultaneous performance in real estate transaction); *see also Rutherford Holdings*, 166 Cal. Rptr. 3d 864 (finding concurrent conditions); *Pittman*, 3 Cal. Rptr. 2d 340 (finding concurrent conditions).

The context of the entire PSA further indicates that the Closing Date was a hard, inflexible deadline. PSA § 2.7, for example, provides for formal procedures through which the Purchaser could extend the Closing Date in exchange for an additional sum added to the Deposit,

and PSA § 6.6 allowed the Seller to postpone the Closing Date for up to 30 days to cure title issues. As the court in *MasTec* recognized, language providing the parties with procedures to extend the closing date indicates that the closing date is a firm and final date, and such contracts can require concurrent performance on that date. *MasTec*, 979 So. 2d at 286 (finding contract required concurrent performance where it stated that it could be "extended by other provisions of [the] Contract"); *see also Addie*, 737 F.3d at 857 (finding concurrent performance required where contract "permitted the buyers to extend the closing date for an additional nonrefundable deposit, which the buyers exercised").

Additionally, the PSA includes two "time is of the essence" clauses. PSA § 18.3 explains that "time is of the essence" with regard to the Closing Date and PSA § 23.11 provides that "[t]ime is of the essence in the performance of all obligations by Purchaser, Seller and Owner under this Agreement." As described above, in property transactions, "time is of the essence" language is a strong indication that the parties intended to require concurrent performance on the closing date. *See, e.g.*, *MasTec*, 979 So. 2d at 286; *Booth*, 94 Fla. at 292. *See also Addie*, 737 F.3d at 589; *Pittman*, 3 Cal. Rptr. 2d at 341-42. Further, as discussed above, the Court's September 8, 2015 order already recognized the hard deadline of the Closing Date, barring any formal agreement to change the date. (R. 463.) Here, the parties did not reach any formal agreement to extend the closing date.

Defendants argue that the process of closing should have occurred in sequence because the closing procedure described in PSA § 14 of listed numbered steps: 14.1 "Transfer of Funds," 14.2 "Delivery of Documents," and 14.3 "Disbursement of Funds and Documents." (R. 1531 at 2-4.) Even if the PSA required that the process described in PSA § 14 occur in sequence, the sequence should have been completed by the Closing Date. The sequential listing of tasks for

the Closing Date does not alter the PSA's requirement of concurrent performance, especially given the PSA's explicit requirement that "the delivery of the Deed to Purchaser by the Seller [be] *concurrent* with the delivery of the Cash to Close to the Seller" and given the contract's consistent use of "time is of the essence" language.  As the Third Circuit explained in *Addie*, a contract with this language requires concurrent performance and in such a contract, "a party is not required to perform until the other party makes a valid offer to perform" and if "no party performs, neither party is in default, nor liable for breach."  737 F.3d at 862.  Here, under both the plain, explicit language, and taken as a whole, the PSA required concurrent performance on the Closing Date.

## II.    Neither Party Breached the PSA Because Both Parties Failed Their Concurrent Obligations

As described above, the PSA required concurrent performance, and it is undisputed that neither party performed on the Closing Date and that the transaction failed to close.  Plaintiffs did not tender the balance of the Purchase Price, and Defendants did not have the title and deed ready.  (R. 1566 at ¶¶ 88, 104; R. 1568 at ¶ 72.)

In similar situations where both parties to a real estate contract have failed to perform their concurrent obligations, as described above, courts typically find that neither party breached the contract and that both parties were discharged from the contract.  In *Addie*, for example, where both parties failed to perform and close the real estate deal on the closing date, the Third Circuit held: "If no party performs, neither party is in default, nor liable for breach."  737 F.3d at 862.  Similarly, in *Pittman*, analyzing a comparable failed real estate transaction, the court explained that "the failure of both parties to perform concurrent conditions does not leave the contract open for an indefinite period so that either party can tender performance at his leisure. The failure of both parties to perform concurrent conditions during the time for performance

results in a discharge of both parties' duty to perform."  3 Cal. Rptr. 2d at 341-42.  *See also*

*Rutherford Holdings*, 166 Cal. Rptr. 3d at 870 ("Where the parties' contractual obligations

constitute concurrent conditions, 'neither party is in default until one party performs or tenders

performance.' ").

In this case, like in the cases described above, both parties failed to perform when

performance was due.  It is undisputed that neither party performed on the Closing Date.

Plaintiffs did not tender the Purchase Price on the Closing Date or anytime thereafter.  (R. 1566

at ¶ 88.)  Defendants did not secure a title commitment until after the Closing Date.  (R. 1568 at

¶ 72; R. 1566 at ¶ 104.)  Defendants' efforts to secure marketable title after the Closing Date are

irrelevant and do not constitute a valid offer to perform their concurrent obligation because, after

the closing date, "neither party was required to perform" since the parties had already been

discharged.  *Addie*, 737 F.3d at 863.  Similarly, the parties' purported good faith efforts to meet

their obligations do not alter the fact that neither party performed on the Closing Date.  *See, e.g.*,

*Addie*, 737 F.3d 854 (finding that neither party breached a land sale contract that required

concurrent performance without discussing good faith).

"[A] closing necessarily requires the willing participation of both parties to the

transaction," and here, neither party participated.  *Hand*, 983 So. 2d at 687.  Because both parties

failed to perform, neither party defaulted or breached the contract.  *Degirmenci v. Sapphire-Fort

Lauderdale, LLLP*, 693 F. Supp. 2d 1325, 1346 (S.D. Fla. 2010) (applying Florida law and

finding that "in the absence of the buyers' tender of the purchase price at closing, the seller never

became obligated to convey title—marketable or otherwise"); *Denton v. Good Way Oil 902

Corp.*, 48 So. 3d 103, 108 (Fla. Dist. Ct. App. 2010) (affirming a denial of "specific performance

on account of the failure of the buyer to tender the funds required by contract on the day

specified for closing"). Neither took the first step to bind the other. Where both parties fail to perform there can be no breach, and the parties are discharged from their contractual duties. *See Addie,* 737 F.3d at 862; *Pittman*, 3 Cal. Rptr. 2d at 342; *Rutherford Holdings*, 166 Cal. Rptr. 3d at 870. As such, the duties of the parties expired after they failed to close on September 8, 2015.

Accordingly, the Court denies both parties' motions for summary judgment.[7] Because all of the counts depend on which party breached the contract under the terms of the PSA, the Court denies summary judgment for both parties on all counts.

## CONCLUSION

For the foregoing reasons, the Court denies Plaintiffs' and Defendants' motions for summary judgment.

**Dated:** December 5, 2017                  **ENTERED:**

_____
AMY J. ST. EVE
United States District Court Judge

---

[7] The parties do not argue unjust enrichment or ask for equitable relief, thus the Court does not address these possible remedies.